**Audrey CATLETT, Widow of William Byrd Catlett, Deceased, Plaintiff–Appellee,**

**v.**

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, et al., Defendant–Appellant.**

Supreme Court of Tennessee, at Knoxville.

July 1, 1991.

**412**

Jeffrey D. Boehm, Gentry & Boehm, Chattanooga, for plaintiff-appellee.

David T. Hooper, Blackburn, Little, Smith & Slobey, Nashville, for defendant-appellant.

## OPINION

DROWOTA, Justice.

In this workers' compensation action the employer, Lawson Electric Company, and its insurer, Indemnity Insurance Company of North America, Defendants–Appellants,

have appealed from a judgment rendered in favor of Audrey Catlett, Plaintiff–Appellee, by the Circuit Court of Hamilton County. Audrey Catlett is the widow of William Catlett, the employee, who died in December, 1988, from lung cancer purportedly caused by prolonged exposure to asbestos while working at a paper mill in Chattanooga known as the Rock–Tenn Company from 1944 to 1981. The issues before this Court are (1) whether William Catlett was a "loaned servant" in relation to Rock–Tenn, such that Lawson Electric should be relieved of liability for any loss under the Workers' Compensation Act, (2) whether the trial court utilized the appropriate compensation rate to compute benefits awarded to the Plaintiff, and (3) whether it was error to award medical expenses to the Plaintiff. We hold that Mr. Catlett was the loaned servant of Rock–Tenn and, accordingly, issues two and three are pretermitted.

Mr. Catlett, an electrician, was hired in 1944 by Terrell Electric Company and continued to work for Terrell until the business ceased operations in 1979. In 1950, he began performing electrical work at Rock–Tenn in Chattanooga for Terrell Electric. It was necessary for Rock–Tenn to hire a licensed electrical contractor to supply the electrician at its plant because of an ordinance of the City of Chattanooga requiring that any electrical installation work had to involve a licensed electrical contractor. Terrell Electric Company fulfilled this role as contractor.

Mr. Catlett's presence at Rock–Tenn increased from 1950 onward so that by 1965 he "became pretty regular" at the Rock–Tenn plant. As a matter of routine, he would report to work at the plant each morning, rather than report to Terrell Electric Company. His relationship with Rock–Tenn developed to the point that he and his wife would attend Rock–Tenn employee picnics. Mr. Catlett was an integral part of a major renovation project in 1965 at Rock–Tenn, but also continued to assist other Rock–Tenn employees in regular electrical maintenance at the plant, to include such tasks as moving wiring from place to place

or replacing old wiring with new wiring. Likewise, employees of Rock–Tenn would be assigned to help him as the circumstances dictated. Rock–Tenn ordinarily had in stock the supplies that Mr. Catlett needed to perform his work at the plant, but in the event necessary equipment was not on hand, he would order it and Rock–Tenn would receive the bill directly.

In 1979, Terrell Electric Company went out of business. Rock–Tenn's vice-president of manufacturing, Henry Little, testified that the company wanted to "keep [Mr. Catlett] in some way or another, under the same conditions we had him." The motivation for Rock–Tenn in keeping Mr. Catlett, as opposed to simply bringing in another electrician, was that Mr. Catlett had developed particular expertise with respect to the electrical needs of the plant gained by virtue of his many continuous years of service there. Also, he was familiar with what jobs had been done in the past, those that were in progress, as well as those that were to be completed in the future. Accordingly, Mr. Catlett contacted Arlie Hyde, President of Lawson Electric Company, and asked if he would be interested in serving as the licensed electrical contractor at Rock–Tenn. As of that time, Mr. Catlett had never done any work for Lawson Electric, and Lawson Electric had not done work on a regular basis for Rock–Tenn. Mr. Catlett wanted Lawson Electric to serve as the licensed contractor so that he, Catlett, would "be able to perform his duty" at Rock–Tenn. It would not have been possible for Rock–Tenn to have hired Catlett directly because it did not have the proper electrical license and therefore had to go through an outside electrical contractor. If Rock–Tenn had not been able to work out an arrangement through Lawson Electric to utilize Mr. Catlett's services, it "would have had to go to some other electrical contractor" to make use of his unique services and abilities. At any rate, Lawson Electric agreed to act as the contractor for Rock–Tenn. Lawson Electric made a monthly ten percent profit on the total cost of the monthly billing to Rock–Tenn for Mr. Catlett's services. The billings from Lawson Electric to Rock–Tenn were based on daily time sheets prepared by Mr. Catlett and submitted to Lawson Electric. Rock–Tenn paid no wages directly to Mr. Catlett and withheld no taxes. It also provided no workers' compensation coverage for him throughout the many years he performed work at the mill.

From 1979, when Lawson Electric took over the Rock–Tenn account, until 1981 when Mr. Catlett retired at age 65, Mr. Catlett worked exclusively at the Rock–Tenn plant. While working at Rock–Tenn, Mr. Catlett was not supervised by Lawson Electric personnel, and Lawson Electric was not requested by Rock–Tenn to do so. Instead, Mr. Catlett's activities were directed entirely by Rock–Tenn personnel. During that time, he did not work at any location other than at the Rock–Tenn plant, and no other Lawson Electric employees worked with him at the plant. According to Lawson Electric, Rock–Tenn scheduled (on a daily basis) the work that Mr. Catlett was to perform, set out how the work was actually to be done, when it was to be done, and set out all other details of work to be performed at Rock–Tenn.

Rock–Tenn never communicated with Lawson Electric to discuss the work that Mr. Catlett was doing or was going to do. Mr. Little testified that he made the decisions at Rock–Tenn about what jobs were to be performed at any given time by Mr. Catlett. If Rock–Tenn had a new job that needed to be undertaken, Mr. Little and the plant engineer would get together and decide what was going to be done and the manner in which it would be completed. It was advantageous for them to seek the advice of Mr. Catlett (which they often did), due to his experience and expertise which they did not have available to them otherwise. They would then turn the job over to Mr. Catlett to complete as he saw fit. These discussions and planning sessions did not involve personnel from Terrell Electric Company or Lawson Electric Company. Moreover, to move Mr. Catlett from one job to another, either Mr. Little or the plant engineer would make that decision, not Terrell Electric or Lawson Electric. The essence of the proof was that Mr. Catlett

reported for work at Rock–Tenn on a daily basis and was told what to do.

Upon Mr. Catlett's retirement in 1981, Lawson Electric was not asked to send a substitute worker to perform the work Mr. Catlett had previously been doing. In 1988, Mr. Catlett died from lung cancer purportedly caused by long term exposure to asbestos at Rock–Tenn. The disease did not incapacitate him from working as he had already retired well before he began experiencing any symptoms.

Following Mr. Catlett's death, his widow filed the instant workers' compensation claim against several defendants, including Lawson Electric Company, its insurer, and Rock–Tenn. Prior to trial, Rock–Tenn was voluntarily dismissed from the case with prejudice, apparently as part of a settlement agreement. The Plaintiff evidently has a companion tort action pending against Rock–Tenn. In any event, upon the conclusion of the trial, the trial judge found in favor of the Plaintiff and against Lawson Electric Company, awarding medical and hospital expenses, funeral expenses, costs for procuring and presenting certain medical proof, and workers' compensation weekly benefits. The court also found that Mr. Catlett was not a loaned servant to Rock–Tenn where the exposure to asbestos had taken place over a period of several years. This appeal followed.

We approach this case mindful that the standard of review by this Court of the findings of the trial court is *de novo* with a presumption of the correctness of the findings, unless the evidence preponderates otherwise. T.C.A. § 50–6–225(e). This standard of review differs from that previously provided and requires this Court to weigh in more depth factual findings and conclusions of trial judges in workers' compensation cases. *Landers v. Fireman's Fund Ins. Co.,* 775 S.W.2d 355, 356 (Tenn. 1989); *Humphrey v. David Witherspoon, Inc.,* 734 S.W.2d 315 (1987).

We begin with the question of whether Mr. Catlett was a "loaned servant" as to Rock–Tenn, thereby relieving Lawson Electric of any workers' compensation liability. The parties agree that the controlling test for when an employee becomes a loaned servant was set out in *Winchester v. Seay,* 219 Tenn. 321, 409 S.W.2d 378 (Tenn.1966). In that case, the injured worker was a regular employee of the Grand Hotel in Chattanooga where he performed maintenance duties, and was paid a regular salary. On the day in question, he was requested by the owner of a restaurant, Mrs. Bush, to adjust an air conditioner at a restaurant located two doors away from the Grand Hotel. He had been advised earlier by his regular employer that he was to assist the owner of the restaurant whenever possible, because she and her husband were regular guests at the hotel. He would be tipped nominally for his services by the owner of the restaurant.

The employee in *Winchester* was injured while repairing an air conditioner in the restaurant. This work was done at the request of the restaurant owner and with the permission, or acquiescence, of the regular employer. The employee sued the owner of the restaurant and his regular employer, Seay. The trial judge dismissed the case, finding that Winchester was a mere casual employee [1] of Mrs. Bush and was not performing any duties at the time of the injury for Seay. This Court reversed, observing that the injured employee had been working for the restaurant owner doing repair work which was necessary to be done in the restaurant and for it alone. It was further noted that none of the work being performed was done for the regular employer, nor was the injured worker at the direction of the regular employer at the time he was injured. The Court held that the injured worker was a "loaned servant" of the restaurant owner and, accordingly, the owner, the special

**1.** A number of cases have dealt with the problem of when a worker is deemed to be a casual employee or a loaned servant. *See, e.g., Yearout v. Trusty,* 684 S.W.2d 612 (Tenn.1984); *Davis v. Gulf Ins. Group,* 546 S.W.2d 583 (Tenn.1977); *Bennett v. Mid–South Terminals Corp.,* 660 S.W.2d 799 (Tenn.App.1983); *Carpenter v. Hooker,* 553 S.W.2d 356 (Tenn.App.1977); *Potts v. Knox–Tenn Rental, Inc.,* 62 Tenn.App. 699, 467 S.W.2d 796 (1970).

employer, became solely responsible for the injury sustained while the worker was adjusting the air conditioner. 219 Tenn. at 328, 409 S.W.2d at 381.

■ In reversing the trial judge, the Court in *Winchester* stated:

"When a general employer loans an employee to a special employer, the special employer becomes liable for workmen's compensation only if

(a) the employee has made a contract of hire, express or implied, with the special employer;

(b) the work being done is essentially that of the special employer; and

(c) the special employer has the right to control the details of the work."

*Winchester*, 219 Tenn. at 327, 409 S.W.2d at 381. The Court indicated that when the above test is satisfied, the burden to compensate is placed upon the special employer whose work is being performed and upon the industry in which the employee is engaged and which is being primarily promoted. In addition to the three-part test announced in *Winchester*, there are a number of factors to be considered in determining the existence or nonexistence of an independent contractor relationship, as opposed to a loaned servant situation. These factors include (1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) self-scheduling of working hours, and (7) being free to render services to other entities. *Bargery v. Obion Grain Co.*, 785 S.W.2d 118, 119–20 (Tenn.1990).

Applying the foregoing principles to the facts contained in this record, we are persuaded that Mr. Catlett was a loaned servant. First, it cannot seriously be argued that the work that was performed was not essentially that of the special employer, Rock–Tenn. Although Mr. Catlett worked very briefly at a couple of other locations in the 1940's and 1950's for the more than 30 years he worked at Rock–Tenn, he never worked elsewhere during his tenure with Lawson Electric. He reported to work each day at Rock–Tenn, and performed electrical services at the plant at least forty hours each week. Indeed, Lawson Electric never requested that Mr. Catlett go to any other job site while he was its nominal employee, consistent with the pre-existing relationship spanning approximately three decades between Terrell Electric, Rock–Tenn, and Catlett.

Concerning that prong of the test requiring the existence of an express or implied employment relationship with the special employer, it is significant that Mr. Catlett labored at Rock–Tenn on a continuous, regular basis beginning in 1950, and continuing until his retirement in 1981. Once he retired, no business relationship continued between Lawson Electric and Rock–Tenn, exposing the true employment relationship in existence between Mr. Catlett and Rock–Tenn. It is obvious from the record that the relationship initiated in 1979 with Lawson Electric was merely a continuation of the working relationship previously in existence between Mr. Catlett, Rock–Tenn, and Terrell Electric. The fact that Rock–Tenn confirmed the relationship with Lawson Electric and acknowledged its willingness to continue with that relationship confirms that Rock–Tenn had already agreed with Mr. Catlett to continue with the status quo, which in and of itself arguably reflects at least an implied employment relationship.

Moreover, it is critical to recognize the apparent intensity of Rock–Tenn's desire to retain the unique services of Mr. Catlett. After stating that it was Rock–Tenn's desire to keep Mr. Catlett "in some way or another because of his expertise, his familiarity with the mill, and he was already working on jobs that we needed to complete," Mr. Little of Rock–Tenn freely acknowledged that if Rock–Tenn and Mr. Catlett had not been able to work out an arrangement through the nominal employer, Lawson Electric, permitting Rock–Tenn to utilize Mr. Catlett's unique services, Rock–Tenn necessarily would have gone to another electrical contractor to facilitate such an arrangement. The obvious focus of such a statement is not simply that Rock–Tenn wanted to hire an electrician

through a licensed electrical contractor just for the sake of doing so, but that it wanted to protect its access to the unique services of Mr. Catlett, and was prepared to accommodate him in order to make that a reality.

The fact that Mr. Catlett actually received his salary from Lawson Electric is not, standing alone, dispositive of this case. The most significant question is not who might deliver an individual a paycheck, but rather the work circumstances under which that paycheck is earned. The proper analysis must be geared toward the substantive relationship, rather than the formal, nominal procedural acts that might be observed in the relationship. The fact that Mr. Catlett received his paycheck from Lawson Electric reflects a procedural formality, rather than the substance of an employment relationship that he had with Rock–Tenn.

Finally, it is significant that in the absence of the local ordinances which compelled the parties to seek an accommodation through a licensed electrical contractor, there would have been no relationship whatsoever between Mr. Catlett and Lawson Electric. And if Lawson Electric had been unable or unwilling to accommodate the continuing relationship between Mr. Catlett and Rock–Tenn, Mr. Catlett and Rock–Tenn would have simply found a nominal employer that was willing to do so. And, again, it is significant that Mr. Catlett worked continuously at Rock–Tenn up until his retirement in 1981, and no business relationship continued between Lawson Electric and Rock–Tenn once he retired.

With respect to the third prong of the test, whether the special employer had the right to control the details of the work, Rock–Tenn consistently told Mr. Catlett what work was to be performed and when it was to be completed. Rock–Tenn had him not only work on major construction projects, but also on regular and mundane electrical maintenance items, where he worked both by himself and with other Rock–Tenn employees. Mr. Catlett was subject to the actual daily supervisory involvement by the plant engineering manager as well as the plant engineer. Mr. Catlett would report to these gentlemen on a daily basis and be told what to do, where to do it, and how to do it. The plant engineer would call Mr. Catlett directly in the event of an emergency or if he needed him to come back to the plant after hours. Lawson Electric was not involved in any of the scheduling or planning or in the actual conducting of the work. Simply put, the supervisory personnel at Rock–Tenn made all decisions about all work that was to be done by Mr. Catlett at all times. It is obvious, based upon this record, that Lawson Electric served only as an official covering for Mr. Catlett, as the material relationship was that which had previously evolved between Rock–Tenn and Mr. Catlett while he was employed by Terrell Electric.

Based upon the foregoing, we conclude that although Mr. Catlett might have been the nominal employee of Lawson Electric, he was also the "loaned servant" of Rock–Tenn. The fact that Lawson Electric kept Catlett's employment records and sent him his check does not foreclose the possibility that he is a loaned servant of Rock–Tenn, in addition to being the nominal employee of Lawson Electric.[2] Having reached this conclusion, it is unnecessary for this Court to address the remaining issues raised by the parties. The judgment of the trial court is reversed, and the case remanded for any further proceedings which may be necessary. Costs are adjudged against the Appellee.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.

---

**2.** This case would likely be viewed differently if Mr. Catlett had been one of a series of electricians sent to Rock–Tenn over the years, or if his personal involvement at the plant had not been indistinguishable from that of any other electrician furnished to Rock–Tenn, or if Rock–Tenn might have easily obtained a substitute for Mr. Catlett. However, due to the knowledge and experience Mr. Catlett had acquired over the thirty years working at Rock–Tenn, Rock–Tenn clearly desired to continue and preserve its relationship with him and him alone.