NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0169n.06
Filed: December 17, 2004

Case No. 03-6507

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LINDA ANDERSON | ) | |
| | ) | |
| *Plaintiff-Appellant,* | ) | |
| | ) | **On Appeal from the United States** |
| v. | ) | **District Court for the Eastern District** |
| | ) | **of Tennessee at Chattanooga** |
| FRU-CON CONSTRUCTION | ) | |
| CORPORATION, FRU-CON TECHNICAL | ) | |
| SERVICES, INC., and FRU-CON | ) | |
| ENGINEERING, INC., | ) | |
| | ) | |
| *Defendants-Appellees.* | ) | |

Before: MOORE, GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

**Edmunds, District Judge.** Plaintiff-appellant, Linda Anderson, ("Plaintiff") filed a

wrongful death action against Defendants Fru-Con Construction Corporation, Fru-Con Technical

Services, Inc., and Fru-Con Engineering, Inc. (collectively referred to as "Fru-Con") in the

United States District Court for the Eastern District of Tennessee based on diversity of

citizenship. The district court granted summary judgment in favor of Defendants and Plaintiff

appealed. For the reasons that follow, this court affirms the district court's ruling.

**I. Background**

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District
of Michigan, sitting by designation.

At the center of this dispute is a contract between BASF Corporation, the employer of Plaintiff's decedent, and Fru-Con. Specifically, on March 22, 2001, BASF Corporation and Fru-Con entered into a Master Agreement ("Agreement") regarding maintenance and construction work to be performed by Fru-Con for the benefit of BASF. Under the Agreement, BASF generates purchase orders to request specific work from Fru-Con. The scope of the work and billing rates were incorporated into the Agreement through two attachments–Attachment A addressed the type of work and Attachment B covered the compensation.

BASF is a company that uses the chemical butadiene at two of its plants located around Chattanooga, Tennessee. BASF decontaminates the tanks that hold the butadiene approximately once every two years and scheduled a decontamination for one of the tanks in Plant 2 (where Plaintiff's decedent worked) for December 3, 2001.

BASF noted that John Edmonds, the BASF employee who had generally performed the decontamination, had recently retired. Edmonds worked at Plant 2 for approximately 32 years and was involved in the decontamination process for 20 years. It was therefore suggested that BASF bring back Edmonds to assist. There was concern, however, with BASF rehiring a retired employee. So, a BASF representative suggested that Fru-Con hire Edmonds. Fru-Con agreed to accommodate this request. BASF was aware that Fru-Con did not have procedures or expertise for decontaminating the tanks; it knew, however, that if Fru-Con hired Edmonds, he could assist the decontamination using the BASF procedures.

BASF initiated contact with Edmonds regarding the project. After this conversation, Edmonds knew that he would be hired by Fru-Con and then would go to the BASF plant to assist in the cleaning. He agreed and was subsequently contacted by Fru-Con to arrange for

2

completion of the paperwork. BASF then generated a purchase order that included only a provision for payment to Edmonds.

On December 3, 2001, Edmonds reported to Bill Robinson of Fru-Con to complete his application, employment documents, and undergo a drug screening. Edmonds was then required to watch a BASF safety video that covered, among other things, the hazards of butadiene. Robinson offered safety gear to Edmonds; however, Edmonds declined because he was still in possession of his old BASF safety equipment.

After taking the drug test, Edmonds reported to BASF's Plant 2 and was told by a BASF supervisor to "go to it." Another BASF employee, William Derryberry, was already at the butadiene tank collecting the necessary equipment for decontamination. A few hours later, the process began.

As noted, BASF has specific procedures for decontaminating the butadiene tanks. First, the tanks must be filled with water and heated to a minimum of 190 degrees Fahrenheit. The temperature is generally required to be maintained for 24 hours, drained, and refilled with cool water. The tank is then inspected for build-up and, if any exists, it is removed. Finally, the tank is returned to service.

However, the BASF engineers determined that this process could be altered. Specifically, they found that the tank only needed to maintain the temperature for 12 hours, not 24. Dale Poole, a BASF employee, advised Edmonds that the process was being shortened. Edmonds was not scheduled to be working at the time the 12 hour period would expire; so, Samuel Anderson, Plaintiff's decedent, was called to the tank to observe the process and explain to the next shift what needed to be done.

3

Around the same time, Edmonds told Poole that a drain line had not been purged and that the plan was to do it the following morning. A discussion ensued about purging the line with hot water and whether this would create a problem. The group determined that it would not and, so, Poole told Edmonds to begin purging the line.

Once the line was opened, a reaction occurred in the tank causing hot water to spill out the top onto Edmonds, Poole, and Anderson. Samuel Anderson died as a result of his injuries.

Plaintiff then filed an action claiming that employees of Fru-Con were negligent in supervising and decontaminating the butadiene tank which caused the death of her husband, Samuel Anderson. Alternatively, Plaintiff asserted that Anderson was an intended third-party beneficiary of the contract between BASF and Defendants. Defendants claimed, however, that Mr. Edmonds was a loaned employee from Fru-Con and, thus, Fru-Con is not vicariously liable for Edmonds's negligence. In addition, Defendants maintain that Anderson was not an intended third-party beneficiary. The district court granted summary judgment in favor of Defendants. Plaintiff filed a timely appeal.

## II. Standard of Review

Decisions granting summary judgment are reviewed de novo. *See*, *e.g.*, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). The moving party need only show that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Once this burden is met, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All justifiable inferences must be drawn in favor of the non-moving party. *See id.* Nonetheless, "[t]he mere existence of a scintilla of evidence in

4

support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. Analysis

#### A. Fru-Con's Liability for Negligence

Plaintiff first claims that Fru-Con should be held liable pursuant to the doctrine of respondeat superior because Edmonds, its alleged agent, acted negligently. "To hold the master/principal liable, it must be established 'that the servant or agent shall have been on the superior's business, acting within the scope of his employment.'" *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 415 (Tenn. Ct. App. 1989)(quoting *Nat'l Life & Accident Ins. Co. v. Morrison*, 162 S.W.2d 501, 504 (Tenn. 1942)).

In some cases, however, "[a]n employee of one employer may become the servant of another and shift the liability for his negligent acts to the second employer." *Id.* at 416 (citations omitted). Under this principle–known as the "borrowed servant" or "loaned employee" doctrine–the second or special employer becomes solely responsible for the negligence of the employee if

> (a) the employee has made a contract of hire, express or implied, with the special employer;
> (b) the work being done is essentially that of the special employer; and
> (c) the special employer has the right to control the details of the work.

*Winchester v. Seay*, 409 S.W.2d 378, 381 (Tenn. 1966)(citations omitted). In this case, the district court correctly concluded that Edmonds was loaned by Fru-Con to BASF and that Fru-Con could not therefore be held liable for Edmonds's negligence.

5

### 1. Express Contract of Hire

The district court found that "Edmonds expressly made a contract of hire with BASF for purposes of decontaminating/cleaning the butadiene tank in early December 2001." *Anderson v. Fru-Con Construction Corporation*, 2003 WL 23471543, slip op. at 9 (E.D.Tenn. 2003). The court reasoned that Edmonds had first been contacted by BASF and agreed to work for them through Fru-Con. *Id.* at 9-10.

Plaintiff argues that this holding is incorrect because Fru-Con paid Edmonds and, further, because an express or implied contract would have violated the Agreement between BASF and Fru-Con. These arguments are not convincing. First, the fact that Fru-Con paid Edmonds does not preclude him from being "loaned" to BASF. Indeed, to be a "borrowed" servant, a person must first have a regular employer. Also, it is unclear how a contract with Edmonds would violate the Agreement; the evidence shows the opposite. A BASF employee asked a Fru-Con employee if Fru-Con would hire Edmonds so that he could help BASF decontaminate the tank. Fru-Con agreed to this arrangement. BASF then contacted Edmonds who also agreed (but understood that, for this to occur, he would have to go through Fru-Con). As noted, Fru-Con did not object to this practice; they agreed to it. Moreover, there is no clause in the Agreement that was violated. BASF offered to hire Edmonds (through Fru-Con); Edmonds agreed. Therefore, the district court properly concluded that Edmonds and BASF had an express contract for hire.

### 2. Work of the Special Employer

Next, the district court held that "the decontamination of the butadiene tank was the work of BASF, not the work of Fru-Con." *Id*. at 10. Plaintiff contends that Edmonds was performing Fru-Con's maintenance requirement under the contract and, thus, the district court erred. It is

6

true that Fru-Con is responsible for "construction and maintenance" work under the Agreement. Under BASF's written procedures, however, decontamination of the butadiene tanks is the responsibility of *production*, not construction or maintenance. In addition, neither the Agreement nor the purchase order at issue lists production or, specifically, decontamination as within the scope of Fru-Con's responsibilities. In fact, the purchase order states that the request was for material handling labor. In other words, Fru-Con was required to provide a laborer; it was not required to complete the specific task of decontaminating the tank.

The surrounding facts also support the conclusion that decontamination of the tank was the work of BASF. As pointed out by the district court, Fru-Con was never involved in the decontamination and did not, historically, do that type of work. *Id.* at 11. Moreover, William Robinson of Fru-Con testified that "we don't even do initial line breaks [at BASF plants.] They empty vessels, empty the line, clear the lines, before we do any maintenance on them. That's BASF policy." *Id.* (quoting Robinson Dep. at 11). In addition, the decontamination procedure was being taped by BASF to be used for future training of BASF employees. *Id.* at 12. Finally, BASF completed the decontamination procedure after the accident without assistance or oversight from any Fru-Con employee.[1] Thus, the district court appropriately held that the decontamination process "was essentially the work of BASF and that neither the Master

---

[1]Defendants point to two other facts that show Edmonds was not a supervisor: first, his compensation rate was lower than normal supervisory rates; second, a request in the purchase order is typically included when Fru-Con was going to be performing supervisory duties; however, there was not such a request in the Edmonds purchase order.

7

Agreement between BASF nor the purchase order . . . made the butadiene tank decontamination either a function, duty or responsibility of [Fru-Con]." *Id.* at 12.[2]

### 3. Controlling the Details of the Work

In examining the third requirement of the "loaned servant" doctrine, the district court determined that BASF had the right to (and actually did) control the work of Edmonds. The court noted three facts that evidence this conclusion: (1) the written procedures for decontamination were BASF's; (2) the supervisors present were all BASF employees; and (3) BASF did change the protocol for decontamination by cutting the time requirements from 24 to 12 hours.[3] *Id.* at 12. Plaintiff makes a number of arguments challenging the court's conclusion; however, they all revolve around a flawed premise–that Edmonds was controlling the decontamination procedure.[4]

---

[2]Plaintiff claims that "loaned" employee situations occur only when the initial employer does not have an interest in the work. Plaintiff cites three cases; however, none of them stand for this proposition. *See Catlett v. Indemnity Ins. Co. of North America*, 813 S.W.2d 411 (Tenn. 1991); *Federal Ins. Co. v. Pennsylvania Nat'l Mutual Casualty*, 2000 WL 1160438 (Tenn. 2000); *Belew v. Lafayette Steel Erector, Inc.*, 1994 WL 51585 (6th Cir. 1994).

[3]The court also noted that the Tennessee Department of Labor Division of Occupational Safety and Health ("TOSHA") investigated the accident and found that Edmonds was under the control of BASF. *Id.* at 13. It does not appear, however, that TOSHA's conclusions are based on personal knowledge. Thus, they are not considered here. *See* FED. R. CIV. P. 56.

[4]Plaintiff claims that "[a]ll of the BASF employees who testified on this issue confirm that Edmonds was in charge of the *details*." (Appellant's Br. at 21)(emphasis added). However, this mischaracterizes the testimony. John Snodgrass of BASF only testified that he did not direct Edmonds's activities. (Snodgrass Dep. at 11.) Dale Poole of BASF also testified that he did not tell Edmonds what to do. (Poole Dep. at 29.) Also, when asked who was in charge of the decontamination project, Poole responded that he "had certain responsibilities. We had a safety person on the job; he [also] had responsibilities. The overall decontamination process was turned over to John [Edmonds]." (*Id.* at 44-45.) Therefore, Sondgrass and Poole only testified that they did not tell Edmonds what to do. The conclusion that Edmonds controlled the details does not follow, however; as explained further below, although he had certain responsibilities, Edmonds could not have been in charge of the details because they were specifically set forth in

Plaintiff first claims that Edmonds must have directed the details of the work because no other BASF employees knew how to decontaminate the tank. However, this conclusion is incorrect. It is true that many BASF employees had not performed the decontamination. That is not to say, however, that other employees were *incapable* of performing the task. BASF created specific procedures for decontamination that other employees could perform; Edmonds just happened to be the person with experience following them. In other words, it is not that Edmonds created or controlled the details of the work; instead, he had experience *following* the details set forth in BASF's procedures. Moreover, as noted by the district court, BASF did alter the details: it changed the time requirements; and, further, a BASF employee directed Edmonds to open the purge valve that resulted in the accident. *Id.* at 6, 12; Edmonds Dep. at 100, 102, 104-05. The district court appropriately determined that BASF controlled the details of the work. Thus, all these elements of the loaned employee test support the District Court's conclusion that Edmonds was a loaned employee.

### 4. Independent Contractor

Plaintiff also contends that Edmonds was an independent contractor and, thus, could not be an employee. In other words, if Edmonds was an independent contractor, he was not Fru-Con's employee and, thus, could not be BASF's loaned employee. There are seven factors to be considered in the independent contractor analysis:

> (1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) self scheduling of working hours, and (7) being free to render services to other entities.

---

BASF's Quality System Procedures manual.

*Masiers v. Arrow Transfer & Storage Co.,* 639 S.W.2d 654, 656 (Tenn. 1982)(citations omitted).

Upon review of those factors, this Court concludes that Edmonds was an employee, not an independent contractor of BASF: he did not control the details of the work;[5] there is no indication that he could only be terminated for cause; he did not have freedom to hire additional employees; he was not required to furnish his own tools and equipment; and, it does not appear that he was completely free to schedule his own hours as BASF set the date for decontamination.[6]

To support her argument, Plaintiff points to three cases involving the independent contractor question: *Lindsey v. Smith & Johnson*, 601 S.W.2d 923 (Tenn. 1980); *Phillips v. Bridgestone/Firestone, Inc.*, 772 F.Supp. 379 (M.D.Tenn. 1991); *Bargery v. Obion Grain Co.*, 785 S.W.2d 118 (Tenn. 1990). These cases do not support Plaintiff's position.

In *Lindsey*, the Tennessee Supreme Court noted that "control over details of performance and methods used to achieve this result" is the primary test for the independent contractor/employee distinction. *Lindsey*, 601 S.W.2d at 925. The court then found that the defendant inspected the progress and suggested large scale changes, but only to the extent necessary to keep the project in accordance with the overall plan. *Id.* at 926. The court further determined that the plaintiff controlled the details and, thus, was an independent contractor. *Id.* Here, as noted above, because he decontaminated the tanks before, Edmonds had *experience* that

---

[5]As can be noted, the first factor of the independent contractor test is equivalent to the third inquiry under the "loaned servant" doctrine.

[6]Plaintiff also argues that Fru-Con was an independent contractor of BASF. This determination is not relevant, however, to determine Edmonds's status. Moreover, even if true, it would not support Plaintiff's contention that Fru-Con should be liable for any alleged negligence by Edmonds.

was helpful to BASF. The procedures or *details* that he followed, however, were set forth by BASF in its Quality System Procedures manual. In other words, BASF did more than simply monitor the progress of Edmonds; it created (and altered) the protocol to be followed.[7]

The *Phillips* court also found that the plaintiff was an independent contractor of the defendant. *Phillips*, 772 F.Supp. at 387. The court reasoned that the defendant did not have the right to control the plaintiff's work because no specific tasks or orders were given to him; the defendant only assigned general work. *Id.* at 386. Here, however, BASF hired Edmonds for a specific task–to assist in the butadiene tank decontamination.[8]

In *Bargery,* the court noted that the primary factor in deciding the independent contractor question is whether there was a right to control the party. *Bargery*, 785 S.W.2d at 120. The court then held that the defendant's

> only control over Plaintiff was the instruction on where to deliver his grain. [The defendant] did not control the details and methods of Plaintiff's work. It did not instruct him on the number of deliveries per day or the routes of the delivery. An instruction on where to deliver grain is a control over the end result of a job.

*Id.* at 120. By contrast, as explained above, BASF did more than direct Edmonds to an end result; the detailed procedures were created and provided by BASF.

---

[7]In addition, the *Lindsey* court noted other factors that pointed to the conclusion that the plaintiff was an independent contractor–e.g., the plaintiff previously had complete control over building houses and other projects for the defendant. *Lindsey*, 601 S.W.2d at 926. However, here the other factors show that Edmonds's status is that of an employee, not an independent contractor.

[8]The *Phillips* court also pointed to other factors that showed an independent contractor relationship: there was no right to termination and the plaintiff was not paid by the defendant. *Phillips*, 772 F.Supp. at 386. Here, as noted above, the additional factors do not weigh in favor of an independent contractor relationship.

11

There is no genuine issue of material fact that John Edmonds was an employee loaned to BASF and acting in that capacity at the time of the accident. In addition, it is undisputed that Anderson was a BASF employee injured while at work. Therefore, the only remedy available to Plaintiff is found within Tennessee's workers' compensation statute. *See Valencia v. Freeland and Lemm Const. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003)(holding that Tennessee's "workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury")(citing TENN CODE ANN. § 50-6-108). The district court's decision dismissing Plaintiff's claim against Fru-Con for the alleged negligence of Edmonds must therefore be affirmed.

### B.       Plaintiff as an Intended Third-Party Beneficiary

In addition to the negligence claim, Plaintiff alleges that her decedent, Samuel Anderson, was a third-party beneficiary of the contract between BASF and Fru-Con. "Generally, contracts are presumed to be executed for the benefit of the parties thereto and not third persons." *Owner-Operator Independent Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001)(citations omitted). There is an exception to this rule, however: "[T]hird parties may enforce a contract if they are intended beneficiaries of the contract." *Id.* (citations omitted). The Tennessee Supreme Court has set forth the appropriate test:

> A third-party is an intended third-party beneficiary of a contract, and thus is entitled to enforce the contract's terms, if
> (1) The parties to the contract have not otherwise agreed;
> (2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and
> (3) The terms of the contract or the circumstances surrounding performance indicate that either:

> (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or
> (b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* at 70. The focus of the district court's analysis was on the second prong. The Tennessee Supreme Court has explained that this part

> ensures that third-party beneficiaries will be allowed to enforce the contract only when enforcement would further the parties' objectives in making the agreement. In applying this part, courts should look to what the parties intended to accomplish by their agreement, and a third-party should not be deemed an intended beneficiary if so doing would undermine the parties' purposes.

*Id.* at 70-71. The district court initially held that the Agreement did not show an express intent to confer a benefit on Plaintiff's decedent. *Anderson*, slip op. at 15. The court went on to examine Article V of the Agreement (requiring Fru-Con to conform to applicable safety laws) and then assumed that the Plaintiff's decedent may have been an intended third-party beneficiary to that section. *Id.* The court held, however, that decontamination of butadiene tanks was not within the scope of Fru-Con's responsibilities and therefore not covered by the contract between BASF and Fru-Con. The district court therefore held that Plaintiff's claim that her decedent was a third-party beneficiary was not applicable.

The district court's reasoning is sound. Plaintiff argues that the safety protections contained in Article V were for the benefit of all BASF workers. Yet, Article V deals with the Contractor's (i.e., Fru-Con's) responsibilities. Plaintiff does not point to any part of the contract that requires BASF, which decontaminated the tank, to follow the same safety requirements.[9] In

---

[9] Of course, the safety laws and regulations themselves create an obligation that BASF is required to follow. The question here, however, is whether *the contract* required BASF to follow the specific requirements.

13

addition, Edmonds's work was outside Fru-Con's requirements under the Agreement. Fru-Con fulfilled its responsibilities under the purchase order by loaning Edmonds to BASF. Edmonds was then under the supervision of BASF. It does not follow that Fru-Con would promise that its employees would follow contractual requirements when the employees were doing work outside the contractual obligations that Fru-Con did not control. Anderson cannot be a third-party beneficiary in this situation because the decontamination was not within the scope of the contract. Therefore, the district court's holding is correct.

## IV. Conclusion

For the foregoing reasons, the court affirms the district court's grant of summary judgment in the Defendant's favor.

14