**Earl Douglas TRYON**

v.

**SATURN CORPORATION.**

Supreme Court of Tennessee,
at Nashville.

Feb. 13, 2008 Session.

May 20, 2008.

Barbara G. Medley, Lewisburg, Tennessee, for the appellant, Earl Douglas Tryon.

Marcia McShane Watson, Nashville, Tennessee, for the appellee, Saturn Corporation.

## OPINION

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, and GARY R. WADE, JJ., joined. CORNELIA A. CLARK, J., not participating.

This appeal involves the application of the statutory caps on permanent partial disability benefits. After sustaining a workplace injury to his neck, an employee filed a complaint in the Circuit Court for Marshall County seeking workers' com-

pensation benefits. Sixteen months after returning to work, and while his workers' compensation case was pending, the employee retired upon the advice of his surgeon. The trial court conducted a bench trial and determined that the employee had not had a meaningful return to work. In accordance with Tenn.Code Ann. § 50–6–241(b) (2005), the court awarded the employee permanent partial disability benefits equal to five and one-half times his medical impairment rating. On the employer's appeal, the Special Workers' Compensation Appeals Panel reduced the permanent partial disability award after determining that the trial court erred by failing to apply the lower benefit cap in Tenn.Code Ann. § 50–6–241(a)(1) (2005). We have determined that the evidence supports the trial court's finding that the employee did not have a meaningful return to work and its decision to award the employee partial disability benefits equal to five and one-half times his medical impairment rating. Accordingly, we reverse the Appeals Panel's decision and affirm the judgment of the trial court.

## I.

Earl Douglas Tryon, now fifty-five years of age, began working for General Motors ("GM") in 1975 following his discharge from the United States Air Force. He worked at the GM plant in Syracuse, New York until 1993 when he transferred to Saturn Corporation's plant in Spring Hill, Tennessee. Mr. Tryon was employed as an operations-technician at the Saturn plant. He has worked building vehicles for GM and Saturn for thirty years.

Mr. Tryon sustained a series of workplace injuries while working at the Saturn plant. On May 19, 1999, he injured his neck while transferring a container filled with parts from a pallet to a rack. He suffered a disc herniation at the C6–7 level, and on June 25, 1999, Dr. Frederick Wade performed surgery to remove the disc and replace it with a piece of bone locked into place with a screwed-in metal apparatus. Mr. Tryon was able to return to work following the surgery without any special work restrictions, and he did not file a workers' compensation claim as a result of this workplace injury.

Mr. Tryon sustained a second workplace injury on June 24, 2003, while riding a bicycle at the Saturn plant.[1] An overhead door struck him in the head while it was being lowered. The impact caused a disc herniation at the C5–6 level. Mr. Tryon continued working, but he also returned to Dr. Wade because he was experiencing neck pain. In July 2003, shortly after being struck by the overhead door, Mr. Tryon was diagnosed with De Quervain's tenosynovitis[2] in both hands.[3] On August 12, 2003, Mr. Tryon had surgery to release his thumb tendons. He returned to work but continued to experience pain as a result of this condition.

Mr. Tryon filed a workers' compensation action in October 2003 in the Circuit Court for Marshall County seeking compensation for his June 2003 neck injury and for his

1. Because of the size of its plant, Saturn provides bicycles to its employees to facilitate moving between the plant's facilities and departments.

2. De Quervain's tenosynovitis is a gradual onset bilateral upper extremity injury. The condition consists of inflammation of the two thumb tendons, the abductor pollicis longus and the extensor pollicis brevis, which causes pain in the wrists and restricts the movement of the tendons in the wrist just above the thumbs.

3. Mr. Tryon had actually started experiencing difficulties with his thumbs in 1995 when he was installing door seals. As far as this record shows, Mr. Tryon continued working without seeking medical assistance or accommodations.

De Quervain's tenosynovitis. Saturn admitted that Mr. Tryon's claim was compensable but took issue with the extent of his impairment related to the workplace injuries and the extent of Mr. Tryon's vocational disability.

On March 11, 2004, seven months following the surgery on Mr. Tryon's hands, Dr. Wade performed a second surgery on Mr. Tryon's neck. This procedure was similar to the first neck surgery. Dr. Wade removed the metal apparatus that he had implanted during the first surgery and replaced it with an apparatus that locked both herniated discs into place. Mr. Tryon returned to work. Even though Dr. Wade placed no restrictions on his work, Mr. Tryon continued to experience pain and discomfort while working. He did not, however, seek a change in his work assignments or request any other accommodation from Saturn because of the pain.

On May 23, 2005, Mr. Tryon was diagnosed as having bilateral carpal tunnel syndrome. To accommodate Mr. Tryon's condition, Saturn placed him on work restrictions that included avoidance of forceful and repetitive grasping with either hand. After Mr. Tryon responded well to injections, Dr. Alton Hunter concluded that Mr. Tryon's carpal tunnel condition did not warrant further work restrictions.

In July 2005, Mr. Tryon was performing hood and roof work. He characterized this as a "heavier job" than the job he had been performing when he was injured in July 2003. One day, while he was performing this "heavier job," Mr. Tryon felt his neck "pop" while he was sliding a metal plate along an overhead roller.[4] The pain he experienced in his neck was severe enough to prompt Mr. Tryon to return to Dr. Wade, the surgeon who had twice operated on his neck.

During a follow-up visit on August 11, 2005, Dr. Wade advised Mr. Tryon that he should consider retirement or disability retirement options, if they were available. Dr. Wade was particularly concerned that a third surgery on Mr. Tryon's neck would not provide him with relief from his pain because of the condition of his neck following the first two surgeries. Despite Mr. Tryon's pain and his own concern about Mr. Tryon continuing to engage in factory work, Dr. Wade did not place any work restrictions on Mr. Tryon.

Despite the workplace injuries he sustained and the pain he was experiencing, Mr. Tryon continued to work at Saturn for sixteen months following the second surgery on his neck. Mr. Tryon later explained that he "didn't want any restrictions [related to his] neck" and that he wanted to try to work at the jobs he was assigned because he was concerned about job security. Finally, on November 1, 2005, soon after earning his full thirty-year retirement, Mr. Tryon retired from Saturn. While Mr. Tryon testified that he would have continued to work after he became eligible to retire, he decided to retire rather than continue working because of the intense neck pain he was experiencing and because of Dr. Wade's advice that he should retire from factory work rather than further exacerbate the deteriorating condition of his neck.

The trial of Mr. Tryon's workers' compensation claim was held on March 10, 2006. Dr. Wade's deposition was part of the evidence submitted to the court. In his deposition, Dr. Wade testified that Mr. Tryon had a 25% whole body medical impairment as a result of his two neck inju-

---

4. Saturn eventually moved Mr. Tryon to another job after his "heavier job" caused him to develop pain in his elbow.

ries. Dr. Wade attributed 15% to the pre-existing impairment caused by his first injury (the May 1999 injury) for which Mr. Tryon had not filed a workers' compensation complaint. He attributed the remaining 10% of Mr. Tryon's impairment to his second injury (the June 2003 injury) in which Mr. Tryon was struck on the head by an overhead door.

In addition to Dr. Wade's deposition, the trial court considered the treatment notes and reports of other physicians who had examined or treated Mr. Tryon. Dr. Kenneth Moore concluded that Mr. Tryon suffered a 4% impairment to each upper extremity as a result of De Quervain's tenosynovitis. Dr. Moore did not impose any work restrictions related to this condition. Dr. Richard Fishbein conducted an independent medical examination with regard to this condition and determined that Mr. Tryon had a 5% impairment to his right upper extremity and a 4% impairment to his left upper extremity.

As is often the case, the vocational experts disagreed over the extent of Mr. Tryon's vocational disability. Mark Boatner, testifying at Mr. Tryon's request, indicated that Mr. Tryon's disability rating was between 99.33% and 100%. Michael Galloway, testifying for Saturn, concluded that Mr. Tryon had no vocational disability because he had not been placed under any permanent work restrictions. However, Mr. Galloway conceded that if Dr. Wade's testimony established that Mr. Tryon was unable to perform industrial work and if Dr. Fishbein's testimony established that Mr. Tryon's pain was limiting, then Mr. Tryon's vocational disability could be between 45% and 50%.

In its April 10, 2006 memorandum opinion, the trial court concluded that Mr. Tryon continued to experience "great pain" from his work-related injuries and that Dr. Wade had recommended that he should retire from industrial work because of the substantial threat posed by his continuing to work in an industrial manufacturing setting. Accordingly, the trial court determined that Mr. Tryon's return to work, even though it had lasted sixteen months, was not meaningful. Therefore, the court concluded that the higher ceiling on benefits contained in Tenn.Code Ann. § 50–6–241(b), rather than the ceiling on benefits contained in Tenn.Code Ann. § 50–6–241(a)(1), should be used to calculate Mr. Tryon's permanent partial disability benefits. Based on the evidence attributing 10% of Mr. Tryon's medical impairment to his second neck injury, the trial court awarded Mr. Tryon a 55%[5] disability to the body as a whole.[6]

Saturn sought appellate review of the vocational disability award associated with Mr. Tryon's neck injury. It asserted that Mr. Tryon had a meaningful return to work and, therefore, that the lower multiplier in Tenn.Code Ann. § 50–6–241(a)(1), rather than a higher multiplier in Tenn. Code Ann. § 50–6–241(b), should be applied. Saturn also argued that the trial court had not made sufficient findings explaining its reason for using the higher multiplier and that the trial court should have limited Mr. Tryon's permanent partial disability rating to 25%.[7]

On June 13, 2007, the Special Workers' Compensation Appeals Panel ("Appeals

---

**5.** 10% × 5.5 [multiplier authorized by Tenn. Code Ann. § 50–6–241(b)] = 55%.

**6.** The trial court also assigned Mr. Tryon a 20% vocational disability to both upper extremities based on his De Quervain's tenosyn-

ovitis. Saturn has not taken issue with this award.

**7.** 10% × 2.5 [multiplier authorized by Tenn. Code Ann. § 50–6–241(a)(1)] = 25%.

Panel") filed an opinion reversing the trial court. The Appeals Panel found that Mr. Tryon had made a meaningful return to work following his second neck injury. Accordingly, the Appeals Panel determined that the trial court should have applied the multiplier in Tenn.Code Ann. § 50–6–241(a)(1) rather than the multiplier in Tenn.Code Ann. § 50–6–241(b) and, therefore, that the trial court had erred by determining that Mr. Tryon was entitled to a permanent partial disability rating of 55% disability to the body as a whole. The Appeals Panel, using the multiplier in Tenn.Code Ann. § 50–6–241(a)(1), reduced Mr. Tryon's neck injury award to 25% of his medical impairment and pretermitted the question of whether the trial court had made sufficiently detailed findings.

Mr. Tryon petitioned for full-court review. We granted his petition to consider in more detail the question of what constitutes a meaningful return to work. We have determined that the Appeals Panel erred by determining that Mr. Tryon made a meaningful return to work. Accordingly, we affirm the trial court's conclusion that Mr. Tryon did not have a meaningful return to work. We have also concluded that the trial court's findings regarding its decision to award permanent partial disability benefits equal to five and one-half times Mr. Tryon's medical impairment rating are sufficient.

## II.

■ This Court's review of decisions in workers' compensation cases is governed by Tenn.Code Ann. § 50–6–225(e)(2) (Supp.2007), which provides that appeals courts must "[r]eview ... the trial court's findings of fact ... de novo upon the rec-

ord of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Appellate courts must make an in-depth examination of the trial court's factual findings and conclusions. *Wilhelm v. Krogers,* 235 S.W.3d 122, 126 (Tenn.2007). When the trial court has heard in-court testimony, considerable deference must be afforded in reviewing the trial court's findings of credibility and assessment of the weight to be given to that testimony. *Whirlpool Corp. v. Nakhoneinh,* 69 S.W.3d 164, 167 (Tenn.2002). However, no similar deference need be afforded to a trial court's findings based upon documentary evidence such as depositions. *Orrick v. Bestway Trucking, Inc.,* 184 S.W.3d 211, 216 (Tenn.2006); *Bohanan v. City of Knoxville,* 136 S.W.3d 621, 624 (Tenn.2004). Similarly, appellate courts afford no presumption of correctness to a trial court's conclusions of law. *Perrin v. Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn.2003).

## III.

■ Employees who sustain a permanent partial disability as the result of a workplace injury are entitled to receive permanent partial disability benefits in accordance with Tenn.Code Ann. § 50–6–241. The maximum amount of benefits that an employee may receive depends on whether the employee returns to work with the pre-injury employer. At all times relevant to this case, employees who were returned to work by their pre-injury employer were entitled to receive a permanent partial disability award up to two and one-half times their medical impairment rating. Tenn.Code Ann. § 50–6–241(a)(1).[8]

---

**8.** The Tennessee General Assembly reduced the two and one-half multiplier to one and one-half for injuries occurring on or after July 1, 2004. Tenn.Code Ann. § 50–6–

241(d)(1)(A). Because Mr. Tryon's neck injuries occurred before July 1, 2004, the two and one-half multiplier in Tenn.Code Ann. § 50–6–241(a)(1) rather than the one and one-half

Employees who were not returned to work by their pre-injury employer, both before and after July 1, 2004, were and are entitled to recover a permanent partial disability award up to six times their medical impairment rating. Tenn.Code Ann. § 50–6–241(b), (d)(2)(A).

For claims arising prior to July 1, 2004, the Workers' Compensation Act does not explicitly address the common circumstance in which an employee who becomes permanently, partially disabled as the result of a workplace injury returns to work for the pre-injury employer but does not remain employed.[9] In this circumstance, employers generally argued that an employee's permanent partial disability benefits could not exceed two and one-half times their medical impairment rating because the employee returned to work. For their part, employees, who tried to return to work but who were unable to continue working, asserted that their permanent partial disability benefits should be capped at six, rather than two and one-half, times their medical impairment rating.

■ In response to these claims, the courts created the concept of a "meaningful return to work."[10] The permanent partial disability benefits of employees who have had a meaningful return to work are capped using the smaller multiplier in Tenn.Code Ann. § 50–6–241(a)(1). On the other hand, the permanent partial disability benefits of employees who have not had a meaningful return to work are capped using the larger multiplier in Tenn.Code Ann. § 50–6–241(b).

■ The circumstances to which the concept of "meaningful return to work" must be applied are remarkably varied and complex. *See Newton v. Scott Health Care Ctr.*, 914 S.W.2d 884, 886 (Tenn.Workers Comp.Panel 1995). When determining whether a particular employee had a meaningful return to work, the courts must assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work. *Lay v. Scott County Sheriff's Dep't*, 109 S.W.3d 293, 297–98 (Tenn.2003); *Nelson v. Wal–Mart Stores, Inc.*, 8 S.W.3d 625, 630 (Tenn.1999). The determination of the reasonableness of the actions of the employer and the employee depends on the facts of each case. *Hardin v. Royal & Sunalliance Ins.*, 104 S.W.3d 501, 505 (Tenn.2003) (quoting *Newton v. Scott Health Care Ctr.*, 914 S.W.2d at 886).

■ As a result of extensive litigation over the concept of "meaningful return to work" in the context of claims for permanent partial disability benefits, we have the benefit of many decisions in which this Court and the Appeals Panel have addressed whether a particular employee has had a meaningful return to work. These decisions provide that an employee has not had a meaningful return to work if he or she returns to work but later resigns or retires for reasons that are reasonably related to his or her workplace

---

multiplier in Tenn.Code Ann. § 50–6–241(d)(1)(A) applies.

**9.** For claims arising after July 1, 2004, the General Assembly has expressly addressed the impact of resignation or retirement with regard to seeking reconsideration of an initial award. An employee who resigns or retires may not seek reconsideration unless his or her resignation or retirement results from a

work-related disability. Tenn.Code Ann. § 50–6–241(d)(1)(B)(iii)(a).

**10.** *Bailey v. Krueger Ringier, Inc.*, No. 02S01–9409–CH–00061, 1995 WL 572056, at *3–4 (Tenn.Workers Comp.Panel May 17, 1995) was the first appellate case to use the "meaningful return to work" terminology.

injury. *Lay v. Scott County Sheriff's Dep't*, 109 S.W.3d at 298; *Hardin v. Royal & Sunalliance Ins.*, 104 S.W.3d at 505–06. Accordingly, the multiplier in Tenn.Code Ann. § 50–6–241(b) is applicable. If, however, the employee later retires or resigns for personal reasons or other reasons that are not reasonably related to his or her workplace injury, the employee has had a meaningful return to work which triggers the two and one-half multiplier allowed by Tenn.Code Ann. § 50–6–241(a)(1). *Lay v. Scott County Sheriff's Dep't*, 109 S.W.3d at 298–99.

The first case employing the concept of "meaningful return to work" involved an employee who resigned after returning to work for less than one month. When asked to explain the reasons for his resignation, the employee stated that he resigned because his physician had advised him to resign and because of the intense pain he was experiencing. On these facts, the Appeals Panel concluded that the employee had not had a meaningful return to work. *Bailey v. Krueger Ringier, Inc.*, 1995 WL 572056, at *3–4. Since 1995, this Court and the Appeals Panel have found that an employee who later resigned or retired did not have a meaningful return to

work when (1) the employee's workplace injury rendered the employee unable to perform his or her job,[11] (2) the employer refused to accommodate the employee's work restrictions arising from the workplace injury,[12] and (3) the employee's workplace injury caused too much pain to permit the employee to continue working.[13]

In other circumstances, both this Court and the Appeals Panel have concluded that an employee made a meaningful return to work even though he or she resigned or retired after returning to work. For example, the courts have determined that an employee who resigned or retired after returning to work had a meaningful return to work when the employee's decision to retire or resign was based on (1) the employee's unfounded anxiety about being transferred to a position that would exceed work restrictions,[14] (2) the employee's belief that the employer was going to sell the business to someone who would fire the employee,[15] (3) the employee's interpersonal conflicts with co-workers,[16] (4) a salary dispute unrelated to the employee's medical problems,[17] (5) an employer's refusal for reasons unrelated to employee's workplace injury to accommodate the schedule of the employee's second job,[18] and (6) the

---

**11.** *See, e.g., Morrow v. Int'l Mill Serv., Inc.*, No. W2003–00410–SC–WCM–CV, 2004 WL 1064299, at *3–4 (Tenn.Workers Comp.Panel May 12, 2004); *Bouldin v. Warren County Sheriff's Dep't*, No. M2003–00602–WC–R3–CV, 2004 WL 358275, at *1, 3 (Tenn.Workers Comp.Panel Feb.26, 2004).

**12.** *See, e.g., Nelson v. Wal–Mart Stores, Inc.*, 8 S.W.3d at 630.

**13.** *See, e.g., Young v. Cumberland County Med. Ctr.*, No. M2005–02550–WC–R3–CV, 2007 WL 439015, at *3–5 (Tenn.Workers Comp.Panel Feb.12, 2007); *Anderson v. Hartsville Convalescent Ctr.*, No. 01S01–9703–CH–00070, 1997 WL 807003, at *1 (Tenn.Workers Comp.Panel Dec.31, 1997).

**14.** *Robbins v. Graphic Packaging Int'l, Inc.*, No. M2006–02213–WC–R3–WC, 2007 WL

2458788, at *5–6 (Tenn.Workers Comp.Panel Aug.31, 2007).

**15.** *Hardin v. Royal & Sunalliance Ins.*, 104 S.W.3d at 506.

**16.** *Eldridge v. Putnam County Bd. of Educ.*, No. M2006–02046–WC–R3–WC, 2007 WL 2333036, at *3–5 (Tenn.Workers Comp.Panel Aug.17, 2007).

**17.** *Davidson v. Lowe's Home Ctr., Inc.*, No. 01S01–9601–CV–00014, 1996 WL 676923, at *3 (Tenn. Workers' Comp. Panel Nov. 25, 1996).

**18.** *Newton v. Scott Health Care Ctr.*, 914 S.W.2d at 885–86.

employee's decision to accept a better job.[19]

In several circumstances, the Appeals Panel has determined that an employee's resignation or retirement was not reasonably related to the workplace injury even though the employee was still experiencing pain or limitations traceable to the workplace injury or had been advised to retire. For example, an Appeals Panel determined that an employee had a meaningful return to work even though she continued to experience back pain because she testified that she could continue to perform her duties despite the pain and that she had resigned to remain at home with her child.[20] Another Appeals Panel found that an employee's retirement was not reasonably related to his workplace injury even though a physician had advised him, as a "friend," to retire because the physician's recommendations were not for medical reasons and because the employee stated that he retired to take advantage of an early retirement benefit package and to pursue farming.[21] Still another Appeals Panel found that an employee who resigned because he believed that his light duty job was only "make work" had a meaningful return to work.[22] Finally, another Appeals Panel determined that an employee's resignation based on his fear of re-injury was not reasonably related to his earlier workplace injury in light of evidence that the employee was under no greater risk of injury as long as he complied with his work restrictions.[23]

## IV.

In its most succinct form, the pivotal issue in this case is whether Mr. Tryon had a meaningful return to work. The trial court determined that Mr. Tryon's retirement was reasonably related to his previous neck injuries. The Appeals Panel disagreed after discounting the retirement advice of Mr. Tryon's physician because the advice was based, in part, on medical conditions that arose after Mr. Tryon's second workplace injury in June 2003. We have determined that the Appeals Panel's interpretation of the physician's testimony regarding the basis for his advice to Mr. Tryon is unduly narrow.

## A.

Dr. Wade performed two surgeries on Mr. Tryon's neck—the first in 1999 and the second in 2004. After returning to work at Saturn for approximately sixteen months following his 2004 neck surgery, Mr. Tryon scheduled an appointment with Dr. Wade because the pain he was experiencing in his neck had become particularly acute after he heard his neck "pop" in July 2005. When Dr. Wade was deposed, he was asked whether he had ever suggested to Mr. Tryon that he stop working. Dr. Wade responded as follows:

19. *Lay v. Scott County Sheriff's Dep't*, 109 S.W.3d at 299.

20. *Griffin v. Nat'l Med. Hosp. of Tullahoma, Inc.*, No. 01S01–9606–CH–00130, 1997 WL 531105, at *1–2 (Tenn. Workers' Comp. Panel Aug. 28, 1997). The physician also testified in this case that the employee would no longer require pain management care and could continue to work in the position she had resigned. *Griffin v. Nat'l Med. Hosp. of Tullahoma, Inc.*, 1997 WL 531105, at *2.

21. *Ralston v. Aerostructures Corp.*, No. M2005–01369–WC–R3–CV, 2007 WL 439024, at *4 (Tenn.Workers Comp.Panel Feb.12, 2007).

22. *Binkley v. Tenn. Diecasting Harvard Indus.*, No. W2002–02188–WC–R3–CV, 2003 WL 22071223, at *4–5 (Tenn.Workers Comp.Panel Aug.28, 2003).

23. *Dowd v. Cassens Transp. Co.*, No. M2005–2632–WC–R3–CV, 2007 WL 715518, at *6 (Tenn.Workers Comp.Panel Mar.8, 2007).

[N]ot ... until the last visit with him, which was August 2005. And I think he basically ... said he'd been moved to a heavier job, having more neck symptoms. 'I've got these other problems.' He had tendonitis in his hands; he had carp[a]l tunnel in his hands. He said '[w]hat do I need to do?' My advice was, '[y]ou need to do anything that would keep these symptoms from necessitating you having another surgery.' Because a third surgery on his neck would have a very high likelihood of not giving him that much pain relief, so I just told him, 'If you have retirement options, that's probably your best interest right now.' ... I think there's a difference between telling somebody you can't work, it's unsafe for you to work and saying it's probably smart for you to look into something less strenuous.

Dr. Wade also testified that Mr. Tryon "had these two fusions, he's showing some signs of another dis[c] starting to wear out, and I just told him that it would probably be reasonable that he look into a nonindustrial-type job." Dr. Wade added that "I think it would be wise [for Mr. Tryon] to not work in an industrial setting."

The trial court interpreted Dr. Wade's testimony as meaning that Mr. Tryon "cannot work at Saturn without grave, unwarranted, and inadvisable risk to [his] medical condition." Furthermore, "Dr. Wade believes [Mr. Tryon] should be out of that work environment." This evidence was particularly persuasive to the trial court because "Dr. Wade was a company doctor" as opposed to being a doctor selected by Mr. Tryon on his own or even Mr. Tryon's independent medical examiner. Accordingly, the trial court determined that Mr. Tryon's decision to retire was reasonably related to his work injury because he was enduring an enormous amount of pain from his 1999 and 2003 neck injuries and even more importantly because the physician provided by his employer had recommended that he should retire for medical reasons.

**B.**

The Appeals Panel's interpretation of Dr. Wade's testimony differed markedly from the trial court's. It determined that Dr. Wade's recommendation "was based not only upon Mr. Tryon's two prior disc fusions but also upon his tendinitis, his bilateral carpal tunnel syndrome and the degeneration of a third cervical disc that Dr. Wade observed on an x-ray taken in July 2005." Because all these conditions occurred or were diagnosed after Mr. Tryon's second neck injury, the Appeals Panel concluded that these conditions "cannot be considered in determining whether Mr. Tryon was able to continue his employment following the work-related injury that is before us." Based upon this reasoning, the Appeals Panel reversed the trial court's finding that Mr. Tryon did not have a meaningful return to work.

Dr. Wade's testimony, however, was predominately focused upon Mr. Tryon's neck injuries rather than his other medical problems. Dr. Wade pointed out that Mr. Tryon "had these two fusions, he's showing some signs of another dis[c] starting to wear out, and I just told him that it would probably be reasonable that he look into a nonindustrial-type job." He also testified that "[b]ecause a third surgery on his neck would have a very high likelihood of not giving him that much pain relief, so I just told [Mr. Tryon], 'If you have retirement options, that's probably your best interest right now.'" Dr. Wade's reference to tendinitis and bilateral carpal tunnel syndrome, while not insignificant, was not the focus of his reasoning for why Mr. Tryon should retire.

The Appeals Panel also attributed the degeneration of a third cervical disc in Mr. Tryon's neck to a separate third neck injury unrelated to the 2003 neck injury referenced in Mr. Tryon's complaint. This conclusion finds some support in Dr. Wade's deposition. However, we are simply not persuaded that it is appropriate on appeal to attribute Mr. Tryon's neck condition as of 2005 to a third unidentified neck injury rather than viewing it as part of the natural deterioration of the condition of his neck flowing from his second neck injury.

The record reflects that both Mr. Tryon and Saturn presented their evidence and legal arguments to the trial court on the basis that the condition of Mr. Tryon's neck when he consulted Dr. Wade in 2005 resulted, not from a subsequent, separate neck injury, but from the injury Mr. Tryon sustained in 2003. Saturn did not even attempt to raise this argument in its appellate brief before the Appeals Panel.

Furthermore, the parties did not plainly err by taking this approach because the natural, inherent physiological deterioration that occurs from a injury, even years later, is attributable to that injury.[24] Mr. Tryon testified that he experienced significant neck pain throughout the sixteen months he worked at Saturn following his second neck surgery. In addition, the record contains evidence that further neck degeneration problems are likely to occur naturally following a second neck surgery. While the Appeals Panel may well be correct in attributing the degeneration of a third cervical disc to a separate third neck injury, under the circumstances presented in this case, the trial court should not be reversed for accepting the parties' decision to treat Mr. Tryon's neck condition in 2005 as resulting from his first two neck injuries rather than a subsequent third unidentified neck injury. *See* Tenn. R.App. P. 13(b).

## C.

Saturn offers three additional bases for concluding that Mr. Tryon had a meaningful return to work. First, it asserts that Dr. Wade's retirement recommendation was based solely on the fact that Mr. Tryon was performing a "heavier job" when he consulted Dr. Wade in July 2005. Second, it argues that Mr. Tryon retired, not because of the pain resulting from his neck injuries, but because he had earned his full retirement benefits by working for thirty years. Third, Saturn contends that Mr. Tryon's decision to retire was unreasonable because he could have continued to work longer had he pursued work accommodations more aggressively. We do not find these arguments persuasive.

Saturn's interpretation of Dr. Wade's testimony is exceedingly narrow. Dr. Wade's recommendation that Mr. Tryon retire was not simply based on the fact that Mr. Tryon had been performing a "heavier job." To the contrary, it was based on Dr. Wade's conclusion that Mr. Tryon should not continue working in an industrial setting. While Dr. Wade stated in his deposition that Mr. Tryon could have continued working at Saturn in a job that was not strenuous on his neck, the record does not indicate that Dr. Wade gave that advice to Mr. Tryon in July or August 2005 or even that such a position would have been available for Mr. Tryon at that time.

█ Pointing to the fact that Mr. Tryon continued to work for sixteen months before he retired, Saturn argues

24. *See, e.g., Gregory v. Bradley County Sheriff's Dep't,* No. E2001–01393–WC–R3–CV, 2002 WL 1050251, at *1–3 (Tenn.Workers Comp.Panel May 20, 2002) (tying degeneration to a prior injury that occurred nearly a decade earlier).

that Mr. Tryon actually retired because he had obtained his full retirement benefits rather than because of his neck pain. An employee's ability to work successfully for an extended period of time after returning to work certainly could be a significant factor in a court's analysis of whether the employee's decision to cease working was truly reasonably related to his or her work injury. However, for injuries occurring prior to July 1, 2004, where that period of time is shorter than four hundred weeks following the employee's return to work,[25] working for an extended period of time does not preclude a finding that the employee did not have a meaningful return to work as long as his or her retirement or resignation is reasonably related to the workplace injury.[26]

Significantly, Mr. Tryon testified that he would have continued working at Saturn if not for Dr. Wade's recommendation that he retire and the pain he continued to experience. The trial court attributed Mr. Tryon's retirement to these factors. The trial court observed Mr. Tryon's in-court testimony and found him to be credible. Given the considerable deference afforded to the trial court's assessment of Mr. Tryon's credibility and the weight to be attributed to Mr. Tryon's testimony,[27] we conclude that the evidence does not preponderate against the trial court's findings.

Nevertheless, Saturn contends that Mr. Tryon's retirement was not reasonably related to his pain or Dr. Wade's medical advice but instead followed immediately after he qualified for his full retirement benefits. It certainly appears that Mr. Tryon "toughed-it-out" until reaching retirement age and then promptly retired. There is, however, nothing improper in Mr. Tryon's decision to continue working to achieve an employment benefit to which he was contractually entitled by his thirty years of service. Regardless of whether Mr. Tryon retired sixteen days or sixteen months after returning to work or whether he retired before or after reaching his full retirement benchmark, the fundamental question remains the same, that is, whether Mr. Tryon's decision to retire was reasonably related to his workplace injury.

The trial court attributed Mr. Tryon's decision to retire to medical advice from a company physician that the condition of Mr. Tryon's neck was such that there was a substantial risk to his health in continuing to work in an industrial manufacturing

**25.** *See* Tenn.Code Ann. § 50–6–241(a)(2). This provision allows an employee to seek reconsideration of an award if he or she is no longer employed by the pre-injury employer as a result of resignation or retirement as long as the resignation or retirement is reasonably related to the work injury. *Hardin v. Royal & Sunalliance Ins.*, 104 S.W.3d at 504–05. This Court has indicated that the same standard should be applied to determine whether an employee had a meaningful return to work as part of an initial assessment as in a reconsideration case. *See, e.g., Lay v. Scott County Sheriff's Dept.*, 109 S.W.3d at 298; *see also, Young v. Cumberland County Medical Center*, No. M2005–02550–WC–R3–CV, 2007 WL 439015, at *4 (Tenn.Workers Comp.Panel Feb.12, 2007).

**26.** For injuries occurring on or after July 1, 2004, the General Assembly has modified the time period for seeking reconsideration where the employee is no longer employed by the pre-injury employer or no longer employed at a wage equal to or greater than the wage being received at the time of the injury. For "body as a whole injuries," the time period for seeking reconsideration remains four hundred weeks. Tenn.Code Ann. § 50–6–241(d)(1)(B)(i). However, where the benefits are received for "schedule member injuries," the time period is instead the number of weeks for which the employee was eligible to receive benefits under Tenn.Code Ann. § 50–6–207. Tenn.Code Ann. § 50–6–241(d)(1)(B)(ii).

**27.** *See, e.g., Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d at 167.

job and the pain that Mr. Tryon endured as a result of his work injuries. The risk to Mr. Tryon's health posed by continuing to work and the significant pain that he was experiencing form a reasonable basis for not continuing to work in automobile manufacturing and are related to his second neck injury.[28] Thus, the trial court did not err in finding that Mr. Tryon's retirement was reasonably related to his work injury and that he did not have a meaningful return to work.[29]

Saturn also argues that Mr. Tryon's decision to retire was unreasonable because he should have sought out work accommodations that would have enabled him to continue working.[30] While there are a variety of interesting legal questions that could arise related to Saturn's argument, these issues are essentially foreclosed under the facts of this case. Dr. Wade did not recommend that Mr. Tryon seek accommodations nor was Dr. Wade's retirement recommendation ambiguous or unreasonable. To the contrary, Dr. Wade expressly encouraged Mr. Tryon to retire, specifically noting that he should not continue to work in an industrial setting due to the condition of his neck. Thus, Mr. Tryon's decision to retire rather than pursuing additional accommodations was not unreasonable but instead an appropriate adherence to advice offered by a company physician.

## V.

■ As a final matter, Saturn mounts a two-fold challenge to the trial court's decision to award Mr. Tryon permanent partial disability benefits equal to five and one-half times his medical impairment rating. First, Saturn argues that the trial court failed to make the specific findings required by Tenn.Code Ann. § 50–6–241(c). Second, Saturn asserts that the award is simply too high.

Where an employee does not have a meaningful return to work, the employee's permanent partial disability benefits may not exceed six times his or her medical impairment rating. Tenn.Code Ann. § 50–6–241(b).[31] As correctly noted by Saturn, "[i]f the court awards a multiplier of five (5) or greater, then the court shall make specific findings of fact detailing the reasons for awarding the maximum impairment." Tenn.Code Ann. § 50–6–241(c). Courts must "consider all pertinent factors, including lay and expert testimony, employee's age, education, skills and training, local job opportunities, and capacity to work at types of employment available in claimant's disabled condition." Tenn.Code Ann. § 50–6–241(c).[32] In an extensive

---

28. *See, e.g., Nelson v. Wal–Mart Stores, Inc.*, 8 S.W.3d at 630; *Young v. Cumberland County Med. Ctr.*, 2007 WL 439015, at *3–5; *Morrow v. Int'l Mill Serv., Inc.*, 2004 WL 1064299, at *3–4; *Bouldin v. Warren County Sheriff's Dep't*, 2004 WL 358275, at *1, 3; *Anderson v. Hartsville Convalescent Ctr.*, 1997 WL 807003, at *1; *Bailey v. Krueger Ringier, Inc.*, 1995 WL 572056, at *2–4.

29. *Lay v. Scott County Sheriff's Dep't*, 109 S.W.3d at 298; *Hardin v. Royal & Sunalliance Ins.*, 104 S.W.3d at 506.

30. Saturn had provided Mr. Tryon temporary work accommodations in the past when he experienced elbow pain while working on vehicle hoods and roofs. For the purpose of this opinion, we will presume that Saturn could have and would have provided Mr. Tryon work accommodations for his neck pain had he sought them.

31. *See also* Tenn.Code Ann. § 50–6–241(d)(2)(A).

32. For injuries occurring on or after July 1, 2004, the legislature has modified the statute so as to provide as follows: "If the court awards a permanent partial disability percentage that equals or exceeds five (5) times the medical impairment rating, the court shall include specific findings of fact in the order that detail the reasons for awarding the maxi-

memorandum opinion, the trial court provided detailed findings that addressed the lay and expert testimony as well as Mr. Tryon's age, education, skills and training, and capacity to work at jobs within his skill level based upon his medical disability. The court explained its rationale for its award in accordance with these findings. Saturn's contention that the trial court did not make detailed findings in accordance with Tenn.Code Ann. § 50–6–241(c) is without merit.

 Saturn also argues that assessing Mr. Tryon's vocational disability at five and one-half times his medical impairment rating was simply too high. Under Tennessee law, "it is well established that the extent of vocational disability is a question of fact to be determined from all the evidence, including lay and expert testimony." *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998). While a trial court may certainly err and reversal be warranted, it is not the role of appellate courts to simply substitute their judgment for the trial court's assessment of the employee's vocational disability. *See, e.g., Phelps v. Mark IV Auto.*, No. W2006–00274–WC–R3–CV, 2007 WL 445640, at *5 (Tenn.Workers Comp.Panel Feb.12, 2007). From our review of the record in this case, we conclude that the evidence does not preponderate against the trial court's findings.

### VI.

We have determined that Mr. Tryon's retirement from Saturn was reasonably related to his 2003 workplace injury. Accordingly, he did not have a meaningful return to work and the multiplier in Tenn. Code Ann. § 50–6–241(b), rather than the multiplier in Tenn.Code Ann. § 50–6–241(a)(1), controls the maximum amount of the permanent partial disability award.

mum permanent partial disability." Tenn.

We also find that the trial court provided sufficiently detailed findings to support its award in this case. Accordingly, we reverse the Appeals Panel's decision and, in doing so, affirm the trial court's decision. We remand the case to the trial court for further proceedings consistent with this opinion. We also tax the costs of this appeal to Saturn Corporation for which execution, if necessary, may issue.

CORNELIA A. CLARK, J., not participating.