# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
## AT JACKSON

July 15, 2021 Session

## JAMES PRESCOTT v. PREMIER MANUFACTURING CORP.

**Appeal from the Chancery Court for Chester County**
**No. 2018-CV-1117  James F. Butler, Chancellor**

———————————————

**No. W2021-00052-SC-R3-WC – MAILED 9/21/21**
**FILED 11/18/21**

———————————————

Employee sustained a back injury during his employment with Employer. Employee subsequently resigned from his employment as a result of the injury and filed a workers' compensation claim. The trial court determined the injury was compensable as an aggravation of pre-existing back problems and awarded benefits. Employer has appealed, asserting the trial court erred in finding the injury was compensable; in adopting the impairment rating assigned by the authorized treating physician; and in applying a four multiplier. The appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law pursuant to Tennessee Supreme Court Rule 51.  We affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e)(2) (applicable to injuries occurring prior to July 1, 2014) Appeal as of Right;**
**Judgment of the Chancery Court Affirmed**

ROBERT E. LEE DAVIES, SR. J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J. and DON R. ASH, SR. J., joined.

Jeffrey G. Foster & Benjamin J. Conley, Jackson, Tennessee, for the appellant, Premier Manufacturing Corporation.

Spencer R. Barnes & Terri S. Crider, Jackson, Tennessee, for the appellee, James Prescott.

# OPINION

## Factual and Procedural Background

James Prescott ("Employee") worked as a tool and die technician for Premier Manufacturing Corporation ("Employer"). On October 1, 2012, Employee suffered a right-hand shrapnel injury when metal fragments ejected from a machine. Employee was treated for his hand injury and returned to work on light duty. On or about October 24, 2012, while lifting a thirty-pound bucket of metal with his left hand, Employee felt a sharp pain down his back that extended to his buttocks, groin, leg, and right ankle.

Employee was initially examined by Dr. Adam Smith, who had treated Employee for his hand injury. At the same time and continuing into 2014, Employee was treated conservatively for his back pain at the Jackson Clinic. During this time, Employee resigned from his employment, indicating he could no longer do his job. Employee was ultimately referred to an authorized treating physician, Dr. Glenn Crosby, a board-certified neurosurgeon. After physical examination and testing, Dr. Crosby's impression was "worsening lumbar disc disease and right lower extremity radiculopathy and nerve damage." He ultimately opined that Employee's symptoms were related to his work injury and were more than likely an aggravation of Employee's pre-existing condition. Dr. Crosby concluded Employee was not capable of returning to work and assigned an impairment rating.

After exhausting the benefit review process, Employee filed his complaint for worker's compensation benefits.[1] The trial court subsequently granted Employer's motion for an independent medical evaluation (IME) by Dr. James C. Varner, a board-certified orthopedic surgeon. In preparation for trial, the parties deposed Employee, Dr. Crosby, and Dr. Varner. These depositions were admitted as exhibits to the trial.

At the October 28, 2020 trial, Employee testified in person. Employee was sixty-six years old at the time of trial and had an eleventh-grade education. Upon leaving high school, he worked as a laborer in the heating and cooling business. Employee subsequently took electronics courses and worked in television repair for almost twenty-four years. With the onset of "cheap" televisions, Employee was essentially forced out of the repair business. Employee next worked in the maintenance department at Volvo for five years before accepting employment at Employer where he was a machinist in tool and die. In

---

[1] A similar action was filed with regard to Employee's hand injury. By agreement, the cases were consolidated. The instant matter relates to the lower back injury.

October 2012, Employee injured his right hand when metal fragments were ejected from the machine. He was treated for his hand injury by Dr. Adam Smith and returned to work with light-duty restrictions. One day while picking up a heavy bucket of points with his left hand, Employee felt a sharp pain and burning sensation down his back that extended to his buttocks, groin, right leg, and right ankle. Employee indicated that although he had suffered from muscle spasms in the past, he had never experienced a similar pain or sensation. Initially, Employee returned to Dr. Smith for treatment of his back injury but Employer eventually referred him to Dr. Crosby. In the interim, Employee resigned from his job because he could no longer do the work. According to Employee, Dr. Crosby discussed two surgical options to relieve Employee's lower back pain. Employee was amenable to the first surgical option proposed by Dr. Crosby; however, the procedure was not approved. Employee declined the more intrusive spinal fusion surgical option.

Employee continued to experience the same back problems, indicating his back was "getting worse." He can no longer participate in hunting or fishing and can no longer ride a motorcycle. Employee has difficulty driving a vehicle, maintaining a small garden, and mowing the lawn. Employee said he could no longer perform the jobs he had held in the past.

On cross-examination, Employee was asked to reconcile certain responses from his earlier deposition with 2012 pre-injury medical records from Dr. Glenn Barnett, who had treated Employee for neck issues at the Semmes-Murphy Clinic. In his deposition, Employee indicated he was not taking any type of pain medication when his October 2012 back injury occurred at work. Further, in his deposition and at trial, Employee said he had not been treated for back pain prior to his injury in this case, describing the back pain he experienced in October 2012 as unlike any pain he had previously experienced. Employer presented Employee with Dr. Barnett's medical record from March 29, 2012, which listed hydrocodone as a "current medication" and contained a notation that "[Employee] also has . . . lower back pain . . . [and] pain that radiates into his legs – pain and numbness in his legs." Employee was shown a similar note from April 5, 2012, that also listed hydrocodone on the current medication list. Employee explained that he took hydrocodone "off and on" during the time period primarily for his neck pain, and while admitting he had some type of back pain with some numbness and tingling down his right leg prior to his work injury, Employee insisted the back pain noted in the earlier records and the back pain he experienced from his work injury were qualitatively different. Employee agreed that he received social security disability and no longer worked.

According to Dr. Crosby's deposition, he first saw Employee as a worker's compensation referral in September 2014. Dr. Crosby took Employee's history, learning specifics of the injury. He noted Employee's complaint of constant back pain with a radicular component in the right leg all the way to the foot with tingling dysesthesias. Dr.

Crosby was aware of the conservative treatment provided thus far including physical therapy and epidural steroid injections. The 2013 MRI Employee brought with him showed a central disc rupture at L4. A physical examination that day revealed Employee had pain with the straight-leg raise, suggesting compression of the nerve root. Dr. Crosby's impression that day was "worsening lumbar disc disease and right lower extremity radiculopathy and nerve damage in setting of a work injury." Dr. Crosby referred Employee for current imaging, including an x-ray and a lumbar spine MRI. The new MRI revealed a ruptured disc at L4 to the right that was causing neuroforaminal stenosis. Dr. Crosby also noted that Employee was suffering from an annular tear of the disc. These findings were consistent with Employee's complaint that most of his pain was from the right side down the right leg. Dr. Crosby offered a surgical procedure called a microdiscectomy to remove part of the disc and take pressure off the nerve.

Employee returned in January 2016 having had no additional treatment. He continued to complain of pain in the back and down the right leg. Dr. Crosby ordered additional imaging that showed Employee had more degenerative findings at two levels, L4-5 and L5-S1. Dr. Crosby felt Employee's condition was worsening. At that point, surgical considerations changed from microdiscectomy to possible fusion surgery. However, Employee wanted to avoid surgery. Dr. Crosby placed Employee at maximum medical improvement (MMI) on February 19, 2016. Dr. Crosby ordered a functional capacity examination (FCE) that revealed Employee could not return to work at Premier and met only the medium classification with a twenty to fifty pound occasional lift and ten to twenty-five pound frequent lift. Dr. Crosby noted that Employee had been off work since 2013 and had been on disability for the past few years. Based on the Sixth Edition of the AMA Guides, Dr. Crosby assigned an impairment rating of fifteen percent (15%) to the body as a whole. Dr. Crosby wrote a letter to Employee's counsel dated January 15, 2016, referencing causation. Dr. Crosby opined that, based on the history, Employee's symptoms were related to his injury "and more than likely were an aggravation of an underlying condition." His opinion remained the same on the date of the deposition.

During cross-examination, Dr. Crosby explained that the patient history contained in his original report came from Employee and was consistent with the history provided by Dr. Smith, indicating the back symptoms and particularly the radiculopathy began after the October 2012 work injury. Dr. Crosby acknowledged that he had not reviewed all of Employee's past medical records and had not reviewed any medical records that preexisted the October 2012 work incident. Dr. Crosby also acknowledged that low back pain with radicular symptoms prior to the work incident could indicate that the ruptured disc preexisted Employee's work injury. Dr. Crosby indicated his causation opinion was based on Employee's subjective complaints and truthfulness regarding when the symptoms began, the imaging, and his examination. He agreed that if the history was incorrect, his causation opinion could be impacted. As to the impairment rating, Dr. Crosby used Table

17-4 Class 2 and 3 based on Employee's disc herniation and two-level spondylosis with radiculopathy.

According to Dr. Varner's deposition, he conducted an IME on August 20, 2019 at Employer's request. He took Employee's history and discussed the October 2012 work incident. Dr. Varner reviewed the medical records of the Jackson Clinic, Dr. Hugh Barnett, Dr. Adam Smith, Dr. Glenn Crosby, Work Plus Rehab, along with diagnostic imaging including an April 2012 MRI from the Jackson-Madison County General Hospital; a March 2013 MRI from Sports Medicine and Spine; and a November 2014 MRI from Hardin Medical Center. According to Dr. Varner, records from the Jackson clinic dating back to 1988 and continuing into 2005 mentioned lower back and/or right leg pain. These records show that by 2001, Employee required pain medication for lower back pain. Dr. Varner also noted that Employee was seen by Dr. Barnett in March 2012 with a description of lower back and bilateral leg pain and numbness. He observed that after the October 2012 work incident, Employee was initially seen by Dr. Smith and had an evaluation by an orthopedic surgeon with conservative treatment at the Jackson Clinic. Dr. Varner also reviewed Dr. Crosby's report.

During his physical examination, Dr. Varner observed that Employee walked with a limp and ambulated with a cane. Employee described pain with straight-leg raise on the right. Dr. Varner saw no evidence of radiculopathy. X-rays revealed degenerative disc findings at both the L4-5 and L5-S1 levels. In his assessment, Dr. Varner noted degenerative disc disease predating the October 2012 injury. In his opinion, based on the history and description provided by Employee, Employee's described work injury "exacerbated underlying pre-existing degenerative disc changes with attendant increase in preexistent symptoms." Dr. Varner noted, however, that no pathology on the MRI studies could definitively be identified as posttraumatic. Based on the AMA Guides, Table 17-4 Class 1, Dr. Varner assigned an impairment rating of seven percent (7%) to the body as a whole, based on degenerative disc disease. Dr. Varner explained that Employee was assigned a Class 1 impairment for documented disc pathology at multiple levels with non-verifiable radicular components.

On cross-examination, Dr. Varner acknowledged that Employee provided him with a history of pre-existing low back problems. He agreed that the October 2012 incident in all likelihood exacerbated Employee's underlying condition but without resulting in an anatomical change. Dr. Varner estimated he spent between thirty-eight and forty-five minutes in total with Employee.

At the conclusion of the trial, the court took the matter under advisement. On November 5, 2020, the court issued its findings of facts and conclusions of law. In short, the court found that Employee's back injury arose out of and in the course of Employee's

employment with Employer; that the back injury was compensable as an aggravation of Employee's pre-existing condition; and that the back injury was the primary reason Employee resigned from employment. In awarding benefits, the court chose Dr. Crosby's fifteen percent (15%) impairment rating and applied a multiplier of four, having concluded Employee did not make a meaningful return to work. Employer has appealed.

## Analysis

### Standard of Review

A reviewing court must presume the trial court's factual findings are correct unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (applicable to injuries occurring prior to July 1, 2014). When the trial judge has had the opportunity to observe a witness' demeanor and to hear in-court testimony, considerable deference is given to the trial court's factual findings. Madden v. Holland Grp. of Tenn., Inc., 277 S.W.3d 896, 898 (Tenn. 2009). When the record contains expert medical testimony presented by deposition, the reviewing court may draw its own conclusions with respect to the weight and credibility of the evidence. Foreman v. Automatic Sys., Inc., 272 S.W.3d 560, 571 (Tenn. 2008).

### Causation/Compensability

Employer first argues the trial court erred in its determination that Employee sustained a compensable work injury. Indeed, "an employee seeking workers' compensation benefits must prove that the injury . . . both arose out of and occurred in the course of employment. Foreman, 272 S.W.3d at 571 (citing Tenn. Code Ann. § 50-6-102(12)(A)(i) (2008)). "In the course of employment" means that the injury occurs while the employee is performing a duty he is hired to perform. Id. (focusing on the time, place, and circumstances of the injury). "Arising out of employment" refers to causation, meaning there is a "causal connection between the conditions under which the work is required to be performed and the resulting injury." Id. at 571-72. Employee carries the burden of proving every element of his case by a preponderance of the evidence. Id. at 572.

In this case, Employee reported that he suffered a back injury on or about October 24, 2012, while lifting a thirty-pound bucket of metal during the performance of his job duties. However, citing past medical records, Employer maintains Employee had a long history of lower back pain and suggests Employee's purported back injury did not arise out of or occur in the course of his employment. Employer introduced medical records indicating Employee was evaluated for some type of back pain as early as 1988. In the ensuing years, Employee was treated for various complaints of lower back pain and was prescribed hydrocodone for the pain. In March 2012, Employer saw Dr. Barnett, who had

performed neck fusion surgery on Employee in 2007. Dr. Barnett noted that Employee had lower back pain, indicating Employee reported "a pain that radiates into his legs and numbness of his legs." In a follow-up visit in April 2012, Dr. Barnett indicated Employee had "degenerative dis[c] disease."

Employer submits that despite these medical records, Employee made unreliable and incorrect statements about his medical history to Drs. Smith, Crosby, and Varner, and while testifying under oath. Employer argues that based on these inconsistencies, the trial court erred in relying on Employee's testimony. Likewise, Employer asserts that the value of the medical opinions of Drs. Crosby and Varner was reduced because of their reliance on Employee's misstatements. As to Employee's testimony, it is well settled that when the trial judge has seen and heard the witness testify in person, the judge's credibility findings are given considerable deference because the trial court had the opportunity to observe the witness' demeanor and hear the in-court testimony. See Foreman, 272 S.W.3d at 571 (citing Whirlpool Corp. v. Nakhoneinh, 69 S.W.3d 164, 167 (Tenn. 2002)). In this instance, the trial court chose to accredit Employee's distinction between his past and present back problems and resolved any conflicts in Employee's favor. Having accredited Employee's testimony, the trial court was therefore not required to reject the deposition testimony of Drs. Crosby and Varner simply because they relied on Employee's representations. In fact, although Dr. Crosby, who had not seen the past medical records, indicated during cross-examination that pre-existing lower back symptoms could affect his opinion, Dr. Crosby's opinion was not seriously challenged or otherwise undermined during cross-examination. Similarly, Dr. Varner, who had the opportunity to view the past medical record, nonetheless did not alter his ultimate opinion that Employee's symptoms reflected an aggravation of his pre-existing condition. Accordingly, we cannot conclude that the trial court erred in accrediting Employee's testimony.

Employer next contends that even with Employee's unreliable testimony, the trial court erred in finding Employee sustained a compensable aggravation of pre-existing back problems. An employer takes an employee "as is" and assumes the responsibility for a work-related injury which aggravates a pre-existing injury. Cloyd v. Hartco Flooring Co., 274 S.W.3d 638, 643 (Tenn. 2008). In Trosper v. Armstrong Wood Prods., 273 S.W.3d 598 (Tenn. 2008), the Tennessee Supreme Court adopted the following rule when an employee seeks compensation based on an aggravation of a pre-existing condition:

> We reiterate that the employee does not suffer a compensable injury where the work activity aggravates the pre-existing condition merely by increasing the pain. However, if the work injury advances the severity of the pre-existing condition, or if, as a result of the pre-existing condition, the employee suffers a new, distinct injury other than increased pain, then the work injury is compensable.

Id. at 645. As noted, the medical proof came from the deposition testimony of Dr. Crosby and Dr. Varner and accompanying exhibits. Both physicians agreed Employee's work injury aggravated his pre-existing condition; however, they held slightly different opinions as to the nature and extent of the aggravation. Based on Dr. Crosby's lengthy treatment of Employee and his status as a surgeon, the trial court accepted Dr. Crosby's opinion that Employee's back condition was advanced and aggravated. Because Drs. Crosby and Varner testified by deposition, the Panel can draw its own conclusions. See Foreman, 272 S.W.3d at 571.

From our own review of the record, we observe that an MRI referenced in Dr. Bennett's April 2012 records indicated Employee had degenerative disc disease and narrowing of disc spaces described by Dr. Bennett as "not a surgical problem." A 2013 MRI taken after Employee's October 2012 work injury showed a central disc rupture at L4. After reviewing the 2013 MRI and examining Employee in September 2014, Dr. Crosby's impression was "worsening lumbar disc disease, right lower extremity radiculopathy, and nerve damage in setting of a work injury." A 2014 MRI revealed a ruptured disc at L4 on the right causing neuroforaminal stenosis. Dr. Crosby also noted Employee was suffering from an annular tear of the disc. At this juncture, Dr. Crosby recommended microdiscectomy surgery. Although unclear, Employee testified the surgery was not approved. When Employee returned to Dr. Crosby in 2016, additional imaging indicated Employee's disc disease had worsened with degenerative findings at L4-5 and L5-S1. Employee declined fusion surgery. On the other hand, Dr. Varner described the aggravation as "attendant increase in pre-existing symptoms, adding that the MRIs demonstrated no pathology that could be definitively identified as posttraumatic."

Again, both highly-qualified physicians concluded Employee's symptoms resulted from an aggravation of his pre-existing condition. Although Dr. Varner suggested that the work injury merely increased Employee's pain, we are persuaded by Dr. Crosby's testimony that Employee's condition had advanced to such a degree that Dr. Crosby offered surgical intervention. We note that just months earlier, Dr. Barnett indicated Employee's then-existing condition was not a "surgical problem." We recognize Dr. Crosby was not privy to the past medical records and that, during cross-examination, he indicated his opinion could be affected by such records. However, in our view the cross-examination did not undermine Dr. Crosby's ultimate opinion. For these reasons, we conclude Employee established he suffered a compensable work injury.

**Impairment Rating**

In its next issue, Employer contends the trial court erred in using Dr. Crosby's fifteen percent (15%) impairment rating instead of Dr. Varner's seven percent (7%) impairment rating to determine Employee's permanent partial disability benefits. Both

experts utilized the AMA Guides.

Dr. Crosby used Table 17-4 of the AMA Guides. He determined that Class 2 and 3 apply to Employee's condition. Accordingly, his fifteen percent (15%) rating was based on Employee's "disc herniation, two level spondylosis with radiculopathy," recognizing that the spondylosis (or degeneration) was not caused by the work accident but opining that the radiculopathy resulted from the work injury. Dr. Varner used Table 17-4 but applied Class 1 in assigning his seven percent (7%) rating for "documented disc pathology at multiple levels with non-verifiable radicular complaints."

Employer maintains the trial court should have used Dr. Varner's impairment rating because (1) Dr. Crosby incorrectly applied the AMA Guides; and/or (2) Dr. Varner noted no pathology on the MRI studies that could be identified as posttraumatic. Employer's arguments stem from a difference in diagnosis as to the degree of aggravation. The interpretation of the AMA Guides as to anatomical impairment is the job of medical experts. Strickland v. U.S. Xpress Enters., Inc., No. E2014–00917–SC–R3–WC, 2015 WL 2066007, at *8 (Tenn. Workers' Comp. Panel Apr. 27, 2015) (citations omitted). When the medical testimony differs, the trial judge must choose which expert to accredit considering among other things the experts' qualifications, the circumstances of their examinations, and the information available to the experts. See id. (citing Kellerman v. Food Lion, Inc., 929 S.W.2d 333, 335 (Tenn.1996)). In this case, each medical expert used Table 17-4 but disagreed on whether Employee should be placed in Class 1 or Class 2 or 3. Each expert chose the placement based on his own diagnosis. Thus, Dr. Crosby did not incorrectly apply the AMA Guides. Instead, he simply made a different diagnosis than Dr. Varner.

The trial court accredited Dr. Crosby's diagnosis and, in turn, adopted Dr. Crosby's impairment rating based in large part on Dr. Crosby's qualifications as a neurosurgeon and the length of time he provided care and treatment to Employee. Having conducted our own review of the expert testimony, we conclude the trial court did not err in adopting Dr. Crosby's fifteen percent (15%) impairment rating.

**Multiplier**

Finally, Employer argues any multiplier applied to Employee's impairment rating "should be low" because Employee's failure to return to work was due in large part to factors not related to his work injury, such as his pre-existing back condition. Our analysis encompasses the concept of "meaningful return to work" and includes an assessment of Employee's vocational disability.

The applicable statute provides that if an employee makes a meaningful return to work, his permanent partial disability benefits are capped at one and one-half (1 ½) times

the medical impairment rating. On the other hand, if an employee does not make a meaningful return to work, he may receive benefits up to six (6) times the medical impairment rating. Tenn. Code Ann. §§ 50-6-241(d)(1)(A), (2)(A) (applicable to injuries occurring on or after July 1, 2004 but before July 1, 2014). In considering whether an employee made a meaningful return to work, we examine "the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to work or remain at work." Woods v. Ace-American Ins., No. E2013-01916-SC-R3-WC, 2014 WL 4049867, at \*5 (Tenn. Workers' Comp. Panel Aug. 15, 2014) (quoting Tryon v. Saturn Corp., 254 S.W.3d 321, 328-29 (Tenn. 2008)). The "touchstone" of the analysis is "reasonableness" guided by the following factors: (1) whether the injury rendered the employee unable to perform his job; (2) whether the employer declined to accommodate work restrictions 'arising from' the injury; and (3) whether the injury caused too much pain to permit the continuation of the work. Id.

In this case, Employee resigned from his employment. If an employee resigns for reasons that are reasonably related to his work injury, the higher cap in section 50-6-241(d)(2)(A) applies. However, if the employee retires for personal or other reasons not reasonably related to his work injury, the lower cap in section 50-6-241(d)(1)(A) is triggered. Id. Thus, the meaningful return to work inquiry is fact-intensive, and resolution of the issue hinges on the trial court's assessment of the employee's credibility. Id.

In this case, Employee submitted his resignation letter on July 11, 2013. In his letter, Employee mentioned an unrelated carpal tunnel diagnosis, his hand injury, and his lower back problem. Employee indicated that he could no longer do his job. At trial, Employee emphasized that his resignation was attributable to his lower back problems. He said he could no longer get to work much less perform the tasks required in his job as a tool and die machinist. The trial court accredited Employee's testimony and found that Employee acted reasonably in resigning.

We find similarities between Employee's resignation and the resignation of the employee in Woods. In Woods, the employee, who had also been under medical treatment for symptoms related to her work-related back injury, ultimately resigned from her job because could not tolerate the physical activities required of her. The trial court found the employee acted reasonably in resigning, and the Woods panel affirmed. Id. at \*6 (citing Howell v. Nissan North America, Inc., 346 S.W.3d 467, 472-73 (Tenn. 2011) in which the employee resigned because she was not physically capable of working on an assembly line). In the instant case, we conclude that the evidence does not preponderate against the trial court's finding that Employee acted reasonably in resigning and therefore did not make a meaningful return to work.

Finally, we consider the extent of Employee's vocational disability and the

appropriate multiplier. The proof established that Employee was age fifty-nine at the time of his injury. He completed the eleventh grade and later obtained his GED. Employee took computer and electronics courses and had a forklift license. In his early years, Employee worked as a laborer in the heating and cooling industry. Subsequently, he worked in television repair and for a short time operated his own television repair shop. When the repair business fizzled, Employee worked in maintenance at Volvo Penta. In hopes of making a greater income, Employee went to work in tool and die for Employer. Employee has not been employed since his injury, and he now receives Social Security disability.

Dr. Crosby ordered a functional capacity evaluation and determined that Employee was not capable of returning to work at Employer. He acknowledged Employee could return to work at a "medium level." However, Employee's employment prospects are clearly limited, and Employee cannot realistically return to any of his former jobs. As noted, the trial court had the authority to apply a multiplier up to six times the medical impairment rating. Under these facts, we cannot conclude that the trial court erred in applying a multiplier of four.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ROBERT E. LEE DAVIES, SENIOR JUDGE

FILED

11/18/2021

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

## JAMES PRESCOTT v. PREMIER MANUFACTURING CORPORATION

**Chancery Court for Chester County**
**No. 2018-CV-1117**

_____

**No. W2021-00052-SC-WCM-WC**

_____

### JUDGMENT ORDER

This case is before the Court upon the motion for review filed by Premier Manufacturing Corporation pursuant to Tennessee Code Annotated section 50-6-225(e)(5)(A)(ii), the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Opinion setting forth its findings of fact and conclusions of law.

It appears to the Court that the motion for review is not well taken and is, therefore, denied. The Panel's findings of fact and conclusions of law, which are incorporated by reference, are adopted and affirmed. The decision of the Panel is made the judgment of the Court.

Costs are assessed to Premier Manufacturing Corporation, for which execution may issue if necessary.

It is so ORDERED.

PER CURIAM

Jeffrey S. Bivins, J., not participating