

**FILED**

**May 24, 2018**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 2:00 P.M.**

**TENNESSEE BUREAU OF WORKERS' COMPENSATION
WORKERS' COMPENSATION APPEALS BOARD
(HEARD APRIL 26, 2018 AT KNOXVILLE)**

| | | |
|---|---|---|
| Richard Lasser | ) | Docket No.  2017-05-0613 |
| | ) | |
| v. | ) | State File No.  22849-2017 |
| | ) | |
| Waste Management, Inc. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims, | ) | |
| Thomas L. Wyatt, Judge | ) | |

---

**Affirmed and Remanded - Filed May 24, 2018**

---

The issue in this interlocutory appeal concerns the employee's entitlement to temporary disability benefits.  The employee declined a temporary transitional position at a non-profit organization arranged by his employer.  The work was admittedly within the employee's work restrictions, but the employee refused the work on the basis the employer could not require him to work for another entity.  The employer responded by terminating temporary disability benefits.  Following a hearing, the trial court denied the employee's request for temporary disability benefits, finding the employee's reasons for refusing to perform the temporary transitional work were purely personal.  The employee has appealed.  We affirm the trial court's order denying the employee's claim for temporary disability benefits and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Judge Timothy W. Conner joined.  Presiding Judge Marshall L. Davidson, III, filed a dissenting opinion.

Zachary D. Wiley, Nashville, Tennessee, for the employee-appellant, Richard Lasser

John E. Anderson, Nashville, Tennessee, for the employer-appellee, Waste Management, Inc.

**Factual and Procedural Background**

On March 29, 2017, Richard Lasser ("Employee"), a truck driver employed by Waste Management, Inc. ("Employer"), was injured in a motor vehicle accident when the

1

truck he was operating was struck by another truck as he merged onto an interstate. Employee was transported to a local hospital and received emergency care for shoulder, neck, and back complaints before being released with instructions to follow up with a primary care physician.

Following additional treatment, Employee was assigned light-duty work restrictions and returned to work with Employer "picking up trash and washing trucks," which Employee testified he performed for "about three days." He reported he became unable to perform the work due to progressively worsening back pain, and he requested that he be allowed to see another doctor. After being given a panel of medical providers, Employee was seen by a physician at Middle Tennessee Occupational & Environmental Medicine on April 18, 2017. The treating doctor assigned temporary work restrictions that limited Employee's physical activities and prevented him from commercial driving.

On the same date the work restrictions were imposed, Employer sent letters to Employee and his attorney advising of Employee's "placement into an appropriate temporary transitional duty" assignment to assist in Employee's return to work. The letter sent to Employee stated that the company with whom Employer had contracted "places employees in temporary positons within the local community to perform light duty work for nonprofit organizations." In this instance, Employee was advised that his assignment was "provided through Cookeville Rescue Mission General Store," and he was also advised of the details of the work, his hourly pay of $17.52, the date he was to report to work, and the person to whom he was to report. An "Employee Acknowledgment" accompanied the letters and requested Employee acknowledge that he understood he would "remain an employee of [Employer] while performing alternative modified work," that he "would continue to be covered under [Employer's] Workers' Compensation program," and that he would "agree to comply with [his] employer's attendance and HR policies."

Employee's attorney promptly responded by sending a letter to Employer advising that Employee had been instructed "not to report to the Cookeville Rescue Mission . . . for what [Employer] has chosen to call a 'temporary alternative modified work assignment.'" The letter questioned the accuracy of the work restrictions identified in Employer's letters and requested Employer to pay Employee temporary partial disability benefits "if [Employer] doesn't have light or modified duty available." A copy of Employee's current restrictions was enclosed with the attorney's letter, which requested that Employer advise "what your positon is with respect to [Employer's] ability to accommodate [Employee's] current medical restrictions." One week later, Employer sent additional information to Employee's attorney, again advising of Employee's "placement into an appropriate temporary transitional duty" assignment at the Rescue Mission and providing details concerning the work as well as the acknowledgment for Employee's signature. Employee did not report for the temporary transitional duty, and Employer

suspended Employee's temporary disability benefits based upon his failure to report for the modified duty work.

At the expedited hearing, the parties stipulated to the work restrictions assigned by the authorized treating doctor, the correspondence between Employer and Employee concerning the temporary transitional duty, and Employee's refusal to report to the Rescue Mission for the temporary duty. Employee was the only person to testify at the hearing. He testified his objection to performing work at the rescue mission did not concern safety issues at that job, a conflict with his schedule, or a concern about the distance between the location of the work and his home. Although he expressed concern that he did not know the rules or procedures governing work at the nonprofit, he testified he did not accept the work because "[i]t just wasn't my job." It is undisputed that Employee's objection to performing work at the rescue mission was unrelated to his physical ability to perform the temporary transitional job duties.

Following the hearing, the trial court denied temporary disability benefits, concluding the case was controlled by *Hackney v. Integrity Staffing Solutions, Inc.*, No. 2016-01-0091, 2016 TN Wrk. Comp. App. Bd. LEXIS 29, at *13-14 (Tenn. Workers' Comp. App. Bd. July 22, 2016). The trial court determined that Employee's reasons for refusing Employer's temporary transitional work program were personal in nature and that the Tennessee Workers' Compensation Law "does not prohibit [Employer] from offering [Employee] work within his restrictions at an entity other than [Employer]." Employee has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2017). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2017).

3

**Analysis**

Employee asserts two issues on appeal, which we have restated slightly: (1) whether Employer's temporary transitional work program is an impermissible attempt to avoid payment of workers' compensation benefits in violation of Tennessee Code Annotated section 50-6-114(a) (2017); and (2) whether the trial court erred in concluding that Employee's refusal to perform temporary transitional work for an entity unaffiliated with his employer was unreasonable.

In analyzing these issues, we must first consider statutory provisions that govern an employee's entitlement to temporary disability benefits. "In all cases of temporary partial disability, the compensation shall be sixty-six and two-thirds percent (66 2/3%) of the difference between the average weekly wage of the worker at the time of the injury and *the wage the worker is able to earn in the worker's partially disabled condition*." Tenn. Code Ann. § 50-6-207(2)(A) (2017) (emphasis added). The statute does not specify the type or location of work or the manner in which the partially disabled worker can earn wages, but instead provides that in those circumstances, "the wage the worker is able to earn in the worker's partially disabled condition" is to be deducted from the worker's average weekly wage to calculate the temporary partial disability benefits due the worker. *Id.*[1]

*Whether the Temporary Transitional Work Program Violates Section 50-6-114(a)*

Tennessee Code Annotated section 50-6-114(a) provides that "[n]o contract or agreement, written or implied, or rule, regulation or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter . . . ." Employee contends Employer's temporary transitional work program is a "device" that operates to relieve Employer of its workers' compensation obligations and, thus, violates this statute. Citing the Tennessee Supreme Court's opinion that recognized a cause of action for retaliatory discharge, *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441 (Tenn. 1984), Employee asserts the temporary transitional work program is a "device" that allows Employer to "evade [its] obligation to pay [temporary partial disability] benefits" and is "no less threatening to the underlying principles of the Workers' Compensation Law than [the] employer's retaliatory discharge of [the] injured employee" in *Clanton*. Although informative to the issue here, the Supreme Court's decision in *Clanton* is neither controlling nor does it support Employee's position.

---

[1] In his dissent, our colleague argues that the statute does not authorize an employer to establish a transitional duty program as was used in the present case. By its express terms, however, the statute governing temporary partial disability benefits does not mandate that an employer return the injured worker to his or her prior job, or even a job at the same work site, but merely references the injured worker's ability to earn wages in his or her partially disabled condition.

4

Unlike the present employment relationship, *Clanton* involved an employer who "for the purpose of relieving itself of its obligations under the Workers' Compensation Law imposed as an implied term or condition of employment the requirement that the [employee] not submit a workers' compensation claim for disability." *Id.* at 442. Citing *Frampton v. Central Indiana Gas Company*, 297 N.E.2d 425 (Ind. 1973), as "the leading case recognizing a cause of action for retaliatory discharge," and noting that Indiana had a statute with language identical to section 50-6-114(a), the Tennessee Supreme Court concluded that "[r]etaliatory discharges completely circumvent [the Workers' Compensation Act's] legislative scheme" and "have the effect of relieving the employer of its duty to compensate and the employee of his or her right to compensation." *Clanton*, 677 S.W.2d at 444. The Supreme Court agreed with Indiana's high court, stating "a retaliatory discharge constitutes a device under [section] 50-6-114." *Id.* at 445.

In the present case, the temporary transitional work program does not relieve the employer of any obligation under the Workers' Compensation Act as was intended in the agreement between the employer and the employee in *Clanton*, whereby the employee would not submit a workers' compensation claim for disability. To the contrary, the temporary transitional work program here continued Employer's obligation to provide temporary partial disability benefits in accordance with Tennessee Code Annotated section 50-6-207(2) (2017). Moreover, requiring Employee to participate in the temporary transitional program, consistent with his medical work restrictions, had no different effect on Employee's entitlement to temporary disability benefits than a modified duty work program in which Employee would work at Employer's facility. Were we to adopt Employee's rationale, *any* light duty program that returns an injured employee to work prior to maximum medical improvement could fall within the ambit of Tennessee Code Annotated section 50-6-114, since all such programs reduce or eliminate an employer's obligation to pay temporary disability benefits. This we decline to do.

The Tennessee Supreme Court's Special Workers' Compensation Appeals Panel has addressed instances in which employees alleged their employers attempted to evade their workers' compensation obligations in the context of section 50-6-114(a). In one instance, the Appeals Panel observed that

[p]rior case law discussing Tennessee Code Annotated section 50-6-114(a) has focused on contracts and agreements where: (1) the employee either waived a right to benefits or a reconsideration of those benefits; or (2) the employer attempted either to deny the employee a remedy or offset the amount of benefits owed under the workers' compensation statutes. In each case, the Court gave particular attention to the public policy considerations of section 50-6-114 in determining whether the underlying contract or agreement violated the Workers' Compensation Law. . . . In [one] case, the Appeals Panel stated that "the purpose of section 50-6-114 was to prohibit[] the use by an employer of any 'contract or agreement, written or implied, or

5

rule[,] regulation or other device' to evade its workers' compensation obligations." . . . In [another case], the Appeals Panel stated that section 50-6-114 "clearly establishes the public policy against the making of any agreement which would reduce an employer[']s liability for permanent disability benefits under the Act."

*Edwards v. Saturn Corp.*, No. M2007-01955-WC-R3-WC, 2008 Tenn. LEXIS 617, at *24-25 (Tenn. Workers' Comp. Panel Sept. 25, 2008) (internal citations omitted).

Here, the temporary transitional work program is not intended, nor does it allow, Employer to avoid any obligation to provide workers' compensation benefits. Rather, taking into account Employee's work restrictions, Employer has arranged for a modified duty placement, consistent with his work restrictions, which would result in Employer's paying Employee's full wages, rather than the lesser amount that temporary partial disability benefits would represent. Accordingly, we hold that Employer's temporary transitional work program does not violate section 50-6-114(a).

Employee additionally argues that public policy weighs against permitting temporary transitional work programs that would place an employee with an entity other than the employer for whom the employee worked at the time of injury. Employee contends these programs would give employers a "device" that would "permit them to harass, bully, and intimidate employees and thereby avoid paying [temporary partial disability] compensation." Employee posits, as an example, a scenario in which an injured worker is required to shovel manure at a hog farm as part of an alternative work placement while on light duty, arguing sophisticated and "unscrupulous" employers would be able to take advantage of unsophisticated workers and thereby defeat their rights under the workers' compensation law. In the present case, however, Employee has not alleged harassment, bullying, or intimidation by Employer. He has not asserted the proposed transitional assignment was unreasonable for any reason other than the work was to be performed for a different employer. Thus, while we need not address Employee's hypothetical example, we note, as addressed below, that the reasonableness of any such temporary transitional work program will be dependent upon the facts of each case.

*Employee's Refusal to Perform the Temporary Transitional Work*

Employee asserts "the controlling legal question is whether [Employee's] refusal to work at the Cookeville Rescue Mission excuses [Employer] from [its] duty to pay [temporary partial disability] compensation." Citing *Tryon v. Saturn Corp.*, 254 S.W.3d 321 (Tenn. 2008), Employee contends that whether an employee's refusal to perform modified duty work is reasonable is a fact-intensive determination, requiring a trial court to assess "the reasonableness of the employer in attempting to return the employee to

work and the reasonableness of the employee in failing to either return to or remain at work." *Id.* at 328.

Tryon was decided long before the 2013 Workers' Compensation Reform Act became effective and involved the application of statutory caps on permanent partial disability benefits. Beginning with the enactment of the 1992 Workers' Compensation Reform Act, in circumstances where an injured employee was eligible to receive permanent partial disability benefits and the employer returned the employee to work at a wage equal to or greater than the employee was earning before the work injury, an award of permanent partial disability benefits was capped at two and one-half times the medical impairment rating determined in accordance with statutory guidelines. Tenn. Code Ann. § 50-6-241(a)(1) (1993). Following the 1992 reforms, the courts "created the concept of a 'meaningful return to work' to address claims implicating these statutory caps." *Tryon*, 254 S.W.3d at 328. In determining whether a particular employee had a "meaningful return to work," courts were to "assess the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to or remain at work." *Id.* (citation omitted).

Against this background, we noted in *Hackney v. Integrity Staffing Solutions, Inc.*, that

> [w]hile the concept of a meaningful return to work is more fully developed in cases involving awards of permanent disability benefits, courts use a similar analytical framework to determine whether an employee is entitled to temporary partial disability benefits in the face of an offer of light duty work. When considering whether there has been a meaningful return to work, the Tennessee Supreme Court has observed:
>
>> There will be a variety of factual situations wherein the courts will be required to construe the meaning of the words [meaningful return to work]. The ultimate resolution of their meaning will be leavened by an assessment of the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to return to work.
>
> If an injured worker is unable to continue working because of the injury, there generally will not have been a meaningful return to work. However, if the employee returns to work and sometime thereafter stops working due to personal reasons or other reasons not related to the work injury, then such circumstances are considered as making a meaningful return to work. Ultimately, the resolution of what is reasonable must rest upon the facts of each case and be determined thereby.

*Hackney*, 2016 TN Wrk. Comp. App. Bd. LEXIS 29, at *11-13 (internal citations and quotation marks omitted).

In this case, Employee contends it is "inherently unacceptable for any employer to force an injured employee to go to work for another entity foreign to the original employer/employee relationship." In support of his assertion, Employee cites a Minnesota Federal District Court case and *Larson'*s treatise on workers' compensation, focusing on language to the effect that an employer can only require its employee to work for another employer with the employee's consent. However, the cited case and the referenced sections of *Larson's* treatise address the necessity of a contract of hire in the employment relationship, but do not concern work performed during periods of temporary disability. Employee's reference to *Larson's* statement that an employee "cannot have an employer thrust upon him," concerns loaned employees and not employees performing temporary transitional work during their recovery period. It has long been the law in Tennessee that when an employer lends an employee to a special employer, in order for the special employer to become liable for workers' compensation benefits, the employee must have made a contract of hire with the special employer. *See Catlett v. Indemnity Ins. Co.*, 813 S.W.2d 411, 415 (Tenn. 1991). We do not find the authorities cited by Employee concerning loaned employees to be supportive of his position here. Rather, we return to the principle expressed in *Tryon* that our analysis must be guided by the facts and circumstances of each case and the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to return to work. Consequently, we reject Employee's argument that a transitional duty assignment at a nonprofit organization is *inherently* unacceptable.

In this regard, we note that, as acknowledged in Employee's brief, he does not argue "that the physical requirements of the work he was offered . . . exceeded his temporary medical restrictions." He does not argue "that the location of the work offered was inconvenient or dangerous," and he does not argue "that the hours offered to him were inconvenient or placed an undue burden on him." Moreover, as stated in Employee's brief, "the parties agree that . . . [Employee] would have earned compensation roughly equivalent to his pre-injury wages if he accepted an 'alternative light duty' position working at the [nonprofit organization]."

Employee asserts "it is entirely reasonable for [him] to refuse [Employer's] effort to loan him to another employer against his will," and "it is entirely unreasonable for [Employer] to walk away from the contractual employer/employee relationship." Neither the letter Employee received concerning the temporary transitional work nor the "Acknowledgment" Employee was asked to sign expressed any intent to sever the employer/employee relationship. The letter stated that the assignment "is temporary in nature and <u>limited to 90 days</u>; and is not a permanent re-assignment." (Emphasis in original.) The acknowledgment stated that Employee "understand[s] that [he] remain[s] an employee of [Employer] while performing alternative modified work." The

acknowledgment further stated that Employee "will continue to be covered under [Employer's] Worker's Compensation program" and noted Employee's "agree[ment] to comply with [his] employer's attendance and HR policies." Nothing in the acknowledgment of the temporary transitional work program suggested the employer/employee relationship would be severed. Indeed, the undisputed proof evidences that relationship, and the terms of that relationship, would remain intact, and that Employee would continue in his employment with Employer throughout the time period he participated in the temporary transitional work program.

In its order denying temporary disability benefits, the trial court cited our decision in *Hackney* wherein we affirmed the trial court's denial of temporary disability benefits to an employee who was offered and refused temporary modified duty work assignments at different businesses in different locations than where she performed her work for the employer prior to her injury. Employee contends *Hackney* is distinguishable because the employee in that case "did not present the single argument that [Employee] raises that 'it is inherently unacceptable for any employer to force any injured employee to go to work for another entity foreign to the original employer/employee relationship.'" While the precise issue raised by Employee differs from the issues raised in *Hackney*, we find the underlying principle as expressed in *Tryon* to be controlling; that is, whether an employee is entitled to temporary partial disability in the face of an offer of modified duty work depends on "the reasonableness of the employer in attempting to return the employee to work and the reasonableness of the employee in failing to either return to work or remain at work." *Tryon*, 254 S.W.3d at 328.

Here, Employee's refusal to accept the temporary work was not based on his physical inability to perform the work. It was not based on the location of the work offered being inconvenient or dangerous. Nor was Employee's refusal to perform the work based on the number of hours offered to him. The parties agreed that Employee's compensation for performing the temporary transitional work was roughly equivalent to his pre-injury wages. Employee's refusal to participate in the temporary transitional work program would not have severed or altered the terms of the employer/employee relationship. As in *Hackney*, we find Employee's reason for not accepting the temporary transitional work to be purely personal – he did not want to perform temporary work for an entity other than Employer.

Moreover, as heretofore noted, Tennessee Code Annotated section 50-6-207(2), which governs the calculation of temporary partial disability benefits, does not limit the wages that an injured worker is able to earn in a partially disabled condition to wages earned from the employer with whom an employee is working at the time of injury. To the contrary, subsection 50-6-207(2)(B) provides that the compensation that is to be paid is "sixty-six and two-thirds percent (66 2/3%) of the difference between the average weekly wage of the worker at the time of the injury and the wage the worker is able to earn in the worker's partially disabled condition." It is not our role to add a limitation to

9

the statutory provision that is not present. Any such decision is for the legislature rather than us. *See Arias v. Duro Standard Prods. Co.*, 303 S.W.3d 256, 260 (Tenn. 2010) ("Our primary objective in construing statutes is to carry out legislative intent without broadening or restricting the statute beyond its intended scope."). We conclude that the preponderance of the evidence supports the trial court's determination that Employee's refusal to perform the work was unreasonable.

## Conclusion

For the foregoing reasons, we hold that the evidence does not preponderate against the trial court's decision. Accordingly, the trial court's decision is affirmed, and the case is remanded for any further proceedings that may be necessary.



**FILED**

**May 24, 2018**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 2:00 P.M.**

**TENNESSEE BUREAU OF WORKERS' COMPENSATION
WORKERS' COMPENSATION APPEALS BOARD
(HEARD APRIL 26, 2018 AT KNOXVILLE)**

| | | |
|---|---|---|
| Richard Lasser | ) | Docket No. 2017-05-0613 |
| | ) | |
| v. | ) | State File No. 22849-2017 |
| | ) | |
| Waste Management, Inc. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims, | ) | |
| Thomas Wyatt, Judge | ) | |

---

**Dissenting Opinion - Filed May 24, 2018**

---

Marshall L. Davidson, III, Presiding Judge, dissenting.

This case involves an important issue of first impression, i.e., whether injured employees can be forced to choose between working for entities foreign to the parties' employment relationship and performing work not in furtherance of the employer's business, or even in the same industry, and having their disability benefits terminated if they refuse. There is no statute, no regulation, and no case that addresses, much less sanctions, this practice. I respectfully dissent.

I.

The employee characterizes the employer's "Transition2Work" program as a "thinly veiled coercive attempt to . . . harass, bully, and intimidate injured workers" designed to avoid the employer's obligations under the workers' compensation laws. While I would not describe the employer's program quite in those terms, I do find troublesome the practice of compelling injured workers to choose between working for an organization having no connection with either the employer or the employee against the employee's will and receiving workers' compensation benefits to which they are entitled.

First, it is important to understand how the employer's program works. Basically, the employer has contracted with an unrelated third party in another state to place its injured employees with organizations unrelated to the employer, the employee, or even to the third party placement company with whom the employer has contracted. If the

1

injured employee refuses to work for the new business or organization, the employer ceases to pay disability benefits, which is what happened in this case. The employee contends the practice of mandating that injured employees work for whatever entity the employer and the third party placement company choose amounts to a tool by which employers can skirt their obligations under the workers' compensation laws. I agree that such a practice is ripe for abuse and may, depending on the circumstances, amount to a "device" used to avoid an employer's obligations as prohibited by Tennessee Code Annotated section 50-6-114(a) (2017).[1]

Second, the employer defends its ability to compel injured employees to work for an unrelated company of its choosing, specifically a nonprofit organization, on the basis that injured employees should return to work as soon as possible. Thus, the argument goes, the employer's transitional assignment policy, operated by the third party with whom the employer has contracted, is good for injured workers and good for the community given the free labor enjoyed by the nonprofit entities for which the injured employees must work. However, these policy arguments fail to address the fundamental question of whether employers should be free to force injured employees to work for a completely unrelated entity performing completely unrelated work under completely different circumstances than the employee contemplated, much less agreed to, when he or she was hired – all under the threat that the injured worker will forfeit his or her workers' compensation disability benefits for refusing.

Third, it is unjust for injured workers to have unrelated employers in an unrelated industry thrust upon them, particularly when they were not apprised of that possibility when they were hired. In this case, for example, the employee was hired to work as a truck driver. Now, however, in order to avoid a forfeiture of benefits, he must work as a janitor at a rescue mission, a business in an entirely different industry, performing entirely different work. The employee describes this situation as being contrary to "the right to select one's employer implicit in the freedom" of contract. I agree.

Fourth, the new entity to which an injured employee may be assigned by an employer and a third party placement company undoubtedly has its own rules, policies, hours, scheduling protocols, and expectations, not to mention its own location to which the injured employee is expected to report and supervisory personnel to whom he or she will be expected to answer. Indeed, in this case, the employee has been assigned a new supervisor at the new entity for whom he must now work. In my view, this practice runs

---

[1] Section 50-6-114(a) states that "no contract or agreement, written or implied, or rule, regulation *or other device*, shall in any manner operate to relieve any employer, in whole or in part, of any obligation" under the workers' compensation laws. (Emphasis added.) My colleagues assert the employer's program neither intends nor permits the employer to avoid its obligations to provide benefits. While I do not profess to know what was intended by the program, one thing is clear: the employer stops paying benefits when an employee objects to being forced to work for an entity unaffiliated with the parties' employment relationship performing work that has nothing to do with the employer's business.

counter to a simple, yet fundamental, principle: businesses and the individuals who wish to work for those businesses "may freely choose whether to enter into the employer-employee relationship." *Yardley v. Hosp. Housekeeping Sys., Inc.*, 470 S.W.3d 800, 803 (Tenn. 2015). Indeed, giving an employer the ability to require its employees to work for whatever entity or organization the employer deems they should work, regardless of whether that entity or organization has any connection to the parties or to the nature or character of the employer's business, turns this fundamental principle on its head.

Fifth, nowhere in Tennessee's workers' compensation statutes is an employer authorized to require an injured employee work for whatever entity the employer decides the employee should work. While some states have legislatively sanctioned transitional work programs in some form or another, Tennessee has not.[2] In my view, the courts should leave it up to policy makers to determine whether practices like those involved here are acceptable and, if so, to set the parameters.

Sixth, the inherently coercive nature of mandating that injured employees work for an unrelated business or organization, performing work not in furtherance of the employer's business or even in the same industry, is troubling. Put simply, if the employee refuses to work for an entity that is foreign to both the employer and the employee, as happened here, the employee forfeits his disability benefits. It would be one thing if this practice bore the legislature's stamp of legitimacy, but it does not.

Seventh, the potential for abuse is real, as are the tangible and lasting effects on injured workers who unexpectedly find themselves having to choose between performing work for a new and distinct entity with its own rules, requirements, and expectations (and having to perform an entirely different type of work at that) and receiving their disability benefits. Injured workers should not have to make that choice.

Eighth, the majority seeks to anchor its analysis in the fact that the statute establishing how temporary partial disability is to be calculated, Tennessee Code Annotated section 50-6-207(2)(A), "does not specify the type or location of work or the manner in which the partially disabled worker can earn wages." Yet, the majority applies a reasonableness standard not found in the statute, or anywhere else, to evaluate cases involving the issue presently before us. Either the statute authorizes practices like the one described here or it does not. In my view, neither section 50-6-207(2)(A) nor any

---

[2] *See generally* Iowa Code § 85.33(3)(a) (2017) ("If the employer offers the employee suitable work and the employee refuses to accept the suitable work offered by the employer, the employee shall not be compensated with temporary partial, temporary total, or healing period benefits during the period of the refusal."); Ohio Rev. Code Ann. § 4123.56(A) (2017) ("Where the employee is capable of work activity, but the employee's employer is unable to offer the employee any employment, the employee shall register with the director of job and family services, who shall assist the employee in finding suitable employment.").

3

other statute addresses, much less sanctions, an employer's ability to specify a new and unrelated organization for whom an injured employee must work.

Ninth, in its decision to uphold the denial of benefits to the employee based on his refusal to work for the new business to which he has been assigned, the majority refers to the loaned servant doctrine.[3] That situation, however, is markedly different because employees assigned to work for some other entity as "loaned servants" are not injured. Consequently, those individuals are better positioned to look elsewhere for employment if they refuse to have a new and different employer foisted upon them. By contrast, workers who are the subject of programs like the one involved in this case are injured. Thus, their options in the open labor market are limited, if not eliminated, depending on the nature of their injuries. Such individuals have little practical choice but to work for the entity to which they are assigned, lest they forfeit their workers' compensation disability benefits.

Finally, the majority refers to *Hackney v. Integrity Staffing Solutions, Inc.*, No. 2016-01-0091, 2016 TN Wrk. Comp. App. Bd. LEXIS 29, at *13-14 (Tenn. Workers' Comp. App. Bd. July 22, 2016) in support of its decision to uphold the denial of benefits to the employee based on his refusal to work for the entity thrust upon him. However, the legality of programs like the one described here was not an issue, and was therefore not addressed, in *Hackney*. Thus, that decision does not support the result reached in this case. In fact, the issue presented has not been addressed by any Tennessee court until now.

II.

In the end, there is no law in Tennessee, statutory or otherwise, that compels the result reached by the majority. Until the General Assembly declares the public policy in this area, I would construe the law as prohibiting employers from requiring injured workers to choose between receiving workers' compensation benefits and working for entities not owned or controlled by the employer, yet selected by the employer, to perform work not in furtherance of the employer's business or even in the same industry.

Accordingly, I would reverse the trial court's decision upholding the employer's refusal to pay benefits to the injured worker.

---

[3] The loaned servant doctrine provides that when "a general employer loans an employee to a special employer, the special employer becomes liable" for workers' compensation benefits if certain circumstances exist. *See Fed. Ins. Co. v. Pa. Nat'l Mut. Cas.*, No. M1999-01917-WC-R3-CV, 2000 Tenn. LEXIS 449, at *6 (Tenn. Workers' Comp. Panel Aug. 17, 2000).

4

FILED

**May 24, 2018**

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

Time: 2:00 P.M.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Richard Lasser | ) | Docket No. 2017-05-0613 |
| | ) | |
| v. | ) | State File No. 22849-2017 |
| | ) | |
| Waste Management, Inc. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Thomas L. Wyatt, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 24th day of May, 2018.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Sent to: |
|---|---|---|---|---|---|---|
| **Zachary D. Wiley** | | | | | X | zwiley@forthepeople.com |
| **John E. Anderson** | | | | | X | janderson@dickinsonwright.com |
| **Thomas L. Wyatt, Judge** | | | | | X | Via Electronic Mail |
| **Kenneth M. Switzer, Chief Judge** | | | | | X | Via Electronic Mail |
| **Penny Shrum, Clerk, Court of Workers' Compensation Claims** | | | | | X | Penny.Patterson-Shrum@tn.gov |

Matthew Salyer
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov